CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD
COMPANY, Plaintiff-Appellant, v. CHICAGO & NORTH
WESTERN TRANSPORTATION COMPANY, Defendant-
Respondent.†

*No. 75-665. Argued November 30, 1977.—Decided March 7, 1978.*
(Also reported in 263 N.W.2d 189.)

† Motion for rehearing denied, without costs, on May 2, 1978.
Mandate amended.

For the appellant there were briefs by *Richard R. Robinson* and *Godfrey & Trump,* and oral argument by *Mr. Robinson,* all of Milwaukee.

For the respondent there was a brief by *Roger S. Bessey, Michael J. Donovan,* and *Borgelt, Powell, Peterson & Frauen, S. C.* of Milwaukee, and oral argument by *Mr. Bessey.*

DAY, J. This is an appeal from a judgment dismissing the plaintiff-appellant, Chicago, Milwaukee, St. Paul and Pacific Railroad Company's (hereafter plaintiff) complaint, following a trial to the court. The plaintiff claims that the defendant-respondent, Chicago and North Western Transportation Company (hereafter defendant) is liable to plaintiff for $2,245,876.45 for breach of a lease of part of plaintiff's depot and track facilities (hereafter depot agreement) in the city of Milwaukee. The trial court found that the operation and effect of the National Rail Passenger Corporation Act (hereafter Amtrak) frustrated the purpose of the depot agreement and that the defendant was relieved of its duty to pay rentals under the agreement.

The issue on this appeal is whether, under the facts described below, the defendant's purpose in leasing the plaintiff's depot facilities was frustrated by the operation and effect of Amtrak?

The facts will be divided into three sections: first, background information on defendant's rail passenger system; second, the purpose and terms of the depot agreement; and third, the effect of Amtrak on the depot agreement.

*Defendant's Rail Passenger System.*

Both plaintiff and defendant corporations are engaged in interstate rail freight carriage. Prior to May 1, 1971

the parties were also responsible for intercity rail passenger service to various parts of the midwest including Milwaukee. Both railroads had been losing money on passenger service for some time. In 1962 the plaintiff and defendant lost $12,648,219 and $7,741,778 respectively on passenger service including commuter operations. In 1970, the last full year of passenger service prior to Amtrak the plaintiff and defendant lost $10,282,544 and $319,384 respectively.

The significant reduction in the defendant's losses between 1962 and 1970 was caused by the elimination of a large part of defendant's more unprofitable passenger service. The defendant was aware that demand for passenger service was declining in the period 1950 to 1965 and trains were being eliminated throughout this period. Defendant's president, Larry Provo, testified that by 1965 defendant had reduced its passenger service as much as it could. Carl Hussey, defendant's assistant vice president for Operating Administration, also testified that in 1965 it appeared as though only a very few more trains could be discontinued. Nevertheless, Hussey testified that after 1965 he would advise discontinuing trains that were losing money and many were.

Both Hussey and Provo testified that in 1965, when the depot agreement was negotiated, a federal takeover of rail passenger service, such as Amtrak, was not contemplated.

During and after 1965 the defendant continued to eliminate passenger service. Between September 6, 1965 and June 22, 1970 the defendant eliminated ten more passenger trains operating between Milwaukee and Green Bay, Madison, Chicago, Ashland or Ishpeming, Michigan. On June 22, 1970, the defendant still operated fifteen passenger trains between Milwaukee and Green Bay or Chicago.

From 1956 to 1970 the defendant's passenger train miles decreased continuously, but the decrease was somewhat slower from 1964 on.

## Depot Agreement.

On July 9, 1964 the defendant's board of directors voted to negotiate with the plaintiff for joint use of plaintiff's Milwaukee depot and 11.1 miles of track in the City of Milwaukee. The defendant needed these facilities because it had sold its lakeshore track and depot property to Milwaukee County for a park expansion and beautification project. As an alternative to using plaintiff's facilities, the defendant could have used its own track on the outskirts of Milwaukee, but it would have been required to build a small passenger depot.

On October 21, 1965, the parties entered into an agreement for the defendant's joint use of plaintiff's depot and 11.1 miles of track in the City of Milwaukee. Initially the plaintiff wanted the agreement to last for twenty-five years and the defendant wanted a five year term. The parties compromised on a term of ten years. The defendant agreed to pay for the partial use of plaintiff's new passenger depot and the right to use the plaintiff's tracks between Washington St. in Milwaukee and Wiscona Junction. The track area was divided into five zones with varying rental rates depending on defendant's use. The defendant also agreed to pay a percentage of taxes and assessments, and to pay for some improvements. The defendant was to pay for maintenance costs in proportion to use.

On May 16, 1966, the defendant began using the plaintiff's depot and operating trains in the five zones of track. On April 30, 1971 the defendant notified the plaintiff that Amtrak had relieved defendant of its

responsibilities as a passenger carrier and that defendant was terminating the depot agreement effective May 1, 1971.

### *Amtrak.*

The National Rail Passenger Corporation, Amtrak, was created October 30, 1970 by 45 U.S.C.A. §541. Under 45 U.S.C.A. §561(a)(1)[1] the corporation could contract with railroads to release them from their entire responsibilities for providing intercity passenger service.

On April 9, 1971, defendant's board of directors authorized entering into a contract with Amtrak to relieve defendant of responsibility for intercity rail service. The plaintiff's board of directors passed a similar authorization on April 15, 1971. On April 16, 1971, both parties signed separate agreements with Amtrak.

In exchange for being relieved of intercity passenger service the railroads were required to pay a fee equal to fifty percent of the company's operating loss from passenger service in 1969. This figure was equal to intercity service loss, less commuter service profit, if any.[2] The defendant paid a buy-in fee of $126,000 and the plaintiff paid a fee of almost $6,000,000.

---

[1] "45 U.S.C.A. §561. . . . (a)(1) On or before May 1, 1971, the Corporation is authorized to contract and, upon written request therefor from a railroad, shall tender a contract to relieve the railroad, from and after May 1, 1971, of its entire responsibility for the provision of intercity rail passenger service. On or after March 1, 1973, but before January 1, 1975, the Corporation is authorized to contract, and upon written request, therefor, shall tender a contract to relieve the railroad of its entire responsibility for the provision of intercity rail passenger service and such relief shall become effective upon the date on which such contract is entered into. . . ."

[2] 45 U.S.C.A. §561(a)(2). The railroads retained their commuter business under the Amtrak agreement. The railroads could also pay their entry fee in equipment at the option of Amtrak.

Neither of the parties were required to join Amtrak. Three railroads the Rock Island, the Rio Grande and the Southern, did not join Amtrak.[3]

On May 1, 1971, Amtrak began operating its trains in the City of Milwaukee, including the zones covered in the depot agreement. The plaintiff formulated a track usage plan for the area around the passenger depot. This plan divided track and depot usage between sole Amtrak use, plaintiff use and joint plaintiff and Amtrak use. Neither the track usage plan nor the depot floor plan made any provision for track or depot usage by the defendant.

There was conflicting testimony at the trial concerning whether or not the plaintiff was willing to let the defendant use the depot and track facilities after Amtrak went into effect. The plaintiff's depot and track facilities in the five zones had the physical capacity to handle both Amtrak and defendant's passenger trains.

Amtrak operated in plaintiff's depot and the five zones after May 1, 1971. In 1971 and 1972 the plaintiff was reimbursed for all solely related passenger expenses including wages, and operating and maintenance expenses for the facility. The plaintiff received no rental or lease payments for the facilities. In November or December of 1972, Amtrak began to take more direct control, putting passenger service employees on the Amtrak payroll and paying a nominal fee for the use of property not covered in the Amtrak agreement.

However, Amtrak did pay plaintiff an additional five percent of total fee for avoidable costs. This five percent fee was to cover costs which could not be directly attributed to the operation of passenger service. The five percent was in the form of overhead and was added on

[3] However, at the time of trial Amtrak operated approximately 237 passenger trains and there were only twelve to fourteen passenger trains in the country not operated by Amtrak.

to the plaintiff's cost basis of the Milwaukee operation, the plaintiff's net bill to Amtrak. For the period of May, 1971, to November, 1973, that five percent figure amounted to $1,124,221.00 for a thirty-one month monthly average of $36,253.00.

Following a trial to the court, Judge LANDRY concluded that the effect of Amtrak substantially frustrated the operation of defendant's passenger trains. On November 24, 1975, judgment was entered in favor of the defendant and dismissing the plaintiff's complaint.

### *Frustration.*

Most of the authorities cited and arguments made by both the trial court and the parties to this appeal are not in point because those authorities do not distinguish between the contract defenses of impossibility and frustration.[4] Impossibility and frustration are related, yet different defenses and their differences are important here. In *Scherrer Constr. Co. v. Burlington Mem. Hosp.*, 64 Wis.2d 720, 733, 221 N.W.2d 855 (1974) and *Estate of Zellmer*, 1 Wis.2d 46, 48, 82 N.W.2d 891 (1957), this court adopted the following formulation of impossibility from Restatement, Contracts §456, p 847:

"Except as stated in sec. 455, or where a contrary intention is manifested, a promise imposes no duty if performance of the promise is impossible because of facts existing when the promise is made of which the promisor neither knows nor has reason to know."

In *Wm. Beaudoin & Sons, Inc. v. Milwaukee County*, 63 Wis.2d 441, 448, 217 N. W. 2d 373 (1974), this court adopted the following definition of frustration from the tentative draft of sec. 285 of Restatement 2d.

---

[4] The few cases cited that involve true frustration discuss the problem in general terms and do not apply the same definition of frustration accepted by this Court in *Wm. Beaudoin & Sons, Inc. v. Milwaukee County*, 63 Wis.2d 441, 448, 217 N.W.2d 373 (1974).

"Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the nonoccurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary."[5]

The comment immediately following the frustration section in the Restatement reads,

"*Rationale.* This Section deals with the problem that arises when a change in circumstances makes one party's performance virtually worthless to the other, frustrating his purpose in making the contract. It is distinct from the problem of impracticability dealt with in the four preceding sections because there is no impediment to performance by either party."

As explained by Corbin a contractor has immediate and ultimate objects of desire:

". . . he bargains for the immediate object in order to attain more remote ends and in the confident belief that the attainment of the first will bring home the second one also." Corbin, *Contracts,* Ch. 77, §1353, p. 1129 (1952).

One of the earliest cases of frustration of purpose was *Krell v. Henry,* 2 K.B. 740 (C.A. 1903), in which the lessee leased an apartment with a window to watch the coronation parade of Edward Albert when he succeeded his mother Queen Victoria. After the agreement, Edward Albert became ill, the parade was cancelled and the use

---

[5] Restatement 2d, *Contracts,* Tentative Draft No. 9 (April 8, 1974) p. 77, sec. 285. This latter section involves frustration of the contract by events occurring after the contract is made. §456 cited above involves impossibility based on facts existing at the time of the contract. However, the difference between impossibility and frustration is not that one involves a supervening event and the other a pre-existing condition. A contract may also become impossible to perform based on a supervening event. Restatement, *Contracts* §457.

of the window was worthless. The lessee refused to pay the rent. The court held that his duty was discharged and that he was not liable for the breach. In *Krell* both parties were capable of performing the immediate objects in the contract, but the lessee's ultimate purpose was frustrated so he was released from his contract nonetheless.

Similarly, in *West Los Angeles Institute of Cancer Research v. Mayer*, 366 F.2d 220 (9th Cir. 1966), Mayer agreed to sell his business property to the research institute on a sale and leaseback arrangement. In a later revenue ruling the I.R.S. determined that the payments to Mayer would not qualify for capital gains treatment. Mayer attempted to rescind the agreement although the institute was willing and able to perform its part of the agreement. The court found that the commercial purpose of the transaction was frustrated because capital gains treatment of the sale proceeds was a basic assumption of the parties. The court stated:

"The consideration bargained for by the sellers was not merely $2,500,000, but $2,500,000 recognized by the I.R.S. as proceeds . . . entitled to capital gains treatment." *Mayer* at 366 F.2d 224.

As in *Krell* the contract was not impossible, nor even impracticable to perform, but the promisor was discharged from his duty because his ultimate or commercial purpose was frustrated.[6]

The contract defense of frustration requires that: (1) the party's principal purposes in making the contract is frustrated; (2) without that party's fault; (3) by the

---

[6] This distinction between frustration and impossibility has been discussed by other courts and commentators. *Glenn R. Sewell Sheet Metal Inc. v. Loverde*, 451 P2d 721, 728 fn. 13, 75 Cal Rptr. 889 (1969). *Lloyd v. Murphy*, 25 Cal.2d 48, 153 P.2d 47, 50 (1944), *Frazier et al. v. Collins et al.*, 300 Ky. 18, 187 S.W.2d 816 (1945), 84 A.L.R.2d 12, §15a, b (1962).

occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made. *Wm. Beaudoin & Sons, Inc., supra.*

In this case the principal or commercial purpose of the defendant under the depot agreement was to operate required intercity rail passenger service in the Milwaukee area in the most efficient manner. Profits were unlikely, but at least losses could be minimized by sharing the plaintiff's facilities.[7] That purpose was substantially frustrated when the defendant and plaintiff joined Amtrak because both parties were released from their rail passenger obligations by paying the buy-in fee. After Amtrak went into effect the use of the facilities (the immediate purpose) was worthless to defendant because defendant was no longer required by the Interstate Commerce Commission to provide unprofitable rail passenger service.[8]

For performance to be excused this frustration of purpose must have occurred without the defendant's fault. In this case the defendant contributed to the frustrating event by joining Amtrak. Not all railroads joined Amtrak and the defendant was not required to either.

The trial court reasoned that the contract was frustrated when the plaintiff joined Amtrak and Amtrak took over the depot and the 11.1 miles of track covered by the

---

[7] There was testimony that defendant's least expensive alternative was to use its own tracks on the outskirts of Milwaukee and build a small depot there.

[8] In applying the frustration defense to this contract, we note that the defendant's purpose here was to minimize passenger losses that it was forced to incur. Usually, frustration occurs when a profit-making venture becomes hopeless because of an event that both parties assumed would not occur. Here, profits were never likely, but the defendant's ultimate purpose was nonetheless frustrated because it was no longer required to provide rail passenger service.

depot agreement.[9] Under this rationale, once Amtrak began using the facilities the defendant was barred from using those same facilities under the anti-competition provision of 45 U.S.C.A. §561(c). That section provides in pertinent part that,

". . . no railroad or any other person may, without the consent of the Corporation, conduct intercity rail passenger service over any route over which the Corporation is performing scheduled intercity rail passenger service pursuant to a contract under this section."

We interpret the above section as forbidding private rail passenger carriers from competing with Amtrak over the same intercity routes. We do not read the section to preclude a private carrier from sharing depot and track facilities at a common end point with Amtrak. Both plaintiff and defendant had separate tracks going to Chicago.

It could also be argued that the plaintiff frustrated defendant's purpose by joining Amtrak because the anti-competition provision of §561(c) would at least have precluded defendant from operating its Chicago to Milwaukee passenger service once Amtrak had chosen plaintiff's route between those two points.[10] However, under §45 U.S.C.A. §564(a),[11] defendant would not only have

---

[9] It is noteworthy that defendant's board of directors authorized entering into a contract with Amtrak before the plaintiff's contracted with Amtrak and before plaintiff's board of directors authorized such action.

[10] 45 U.S.C.A. §561(c) may or may not have applied to this situation. Both parties operated passenger trains between Milwaukee and Chicago, but the plaintiff used a different route.

[11] "§564. *Discontinuance Of Service.* (a) Unless it has entered into a contract with the Corporation pursuant to section 561(a)(1) of this title, no railroad may discontinue any intercity passenger train whatsoever prior to January 1, 1975, the provisions

been allowed to continue its Chicago-Milwaukee service, it would have been required to do so until January 1, 1975.

The defense of frustration is also unavailable to the defendant here because the non-occurrence of the frustrating event was not a basic assumption on which the contract was made. The foreseeability of the frustrating event is a factor to consider ". . . but the mere fact that the event was foreseeable does not compel the conclusion that its non-occurrence was not such a basic assumption."[12]

". . . . foreseeability of the frustrating event is not alone enough to bar rescission if it appears that the parties did not intend the promisor to assume the risk of its occurrence." *Mayer,* at 336 F.2d 225.[13]

In this case defendant's executives testified that defendant had already reduced rail passenger service as much as possible in 1965 and that a federal takeover of rail passenger service was not contemplated. Another of defendant's officers testified that he would advise discontinuing trains that were losing money and some obviously were in 1965. From September 6, 1965 to June 22, 1970 the plaintiff eliminated forty percent of its pas-

of any other Act, the laws or constitution of any State, or the decision or order of, or the pendency of any proceeding before, a Federal or State court, agency, or authority to the contrary notwithstanding. On and after January 1, 1975, passenger train service operated by such railroad may be discontinued under the provisions of section 13a of Title 49. Upon filing of a notice of discontinuance by such railroad, the Corporation may undertake to initiate passenger train operations between the points served."

[12] Restatement 2d, *Contracts,* §285, *supra,* Comment.

[13] In *Mayer* the court found that the possibility of an adverse revenue ruling was foreseeable, but that the Mayers did not assume the risk of an adverse ruling because during the contract negotiations they stated that they were relying on the transaction not being challenged.

senger trains. The defendant's passenger train mileage decreased continuously from 1956 to 1970, but the rate of reduction was slower after 1964.

The evidence shows that the defendant may not have contemplated a federal take-over of their passenger service, but they did have reason to foresee further passenger reductions.

The negotiations and provisions of the depot agreement also indicate that further passenger reduction were considered,

"It is settled that if the parties have contracted with reference [to the frustrating event] or have contemplated the risks arising from it, they may not invoke the doctrine of frustration, to escape their obligations." *Glenn R. Sewell Sheet Metal, Inc. v. Loverde*, 451 P.2d 721, 728 fn. 13, 75 Cal. Rptr. 889 (1969).

Article III (1) (a) of the depot agreement was modified during negotiations to read as follows:

"Except for payments otherwise accruing after the North Western Company terminates its use of the facilities covered by this agreement pursuant to the provisions contained in Paragraph (b), Section 1 of Article IV, each and all of the annual rents, so-called, shall be paid in advance, in equal monthly payments on the first day of every month during the term for which this contract is made, and <u>except as aforesaid,</u> the North Western Company shall not be released, ~~nor will it claim to be released,~~ from any of said payments by reason of its abandonment of use or surrender of the premises on which such rentals are charged, or by reason of its abandonment of use or surrender of the premises on which such rentals are charged, or by reason of its exclusion from the use of said premises for any wilful violations of its covenants and agreements in this contract contained; . . ."

The underlined portion is an addition; the lined out portion a deletion. This change was apparently made in response to a question by Larry Provo, defendant's president, asking whether the original version would mean

that defendant would not get a decrease in rentals if ". . . entailment (sic) of passenger service warrants such a change."

In the final draft of the agreement Article VII, sec. 7,[14] appeared for the first time. That section provided for a reduction of the rental base when facilities were taken out of joint service.[15] Defendant points to the modification in Article III, sec. (1) (a) and the addition of Article VII, sec. 7, to show that nothing in the contract would require further payment of rent under the circumstances that developed.

This argument backfires on the defendant. If the contract provisions can be interpreted to mean that the parties contracted on what would happen in the event of future joint facility abandonment, then the defendant cannot also claim that the non-occurrence of further passenger reductions was a basic assumption of the contract. The question posed by defendant's president Provo shows that abandonment of facilities was very much in the minds of the parties during negotiations. The defendant's argument based on Article VII, sec. 7 suggests the same result.

The testimony and contract negotiations and provisions show that the parties did not foresee that Amtrak would take over rail passenger service. But the parties did foresee and bargained on the assumption that further reductions in rail passenger service were a distinct possibility. The defendant persuasively argues that Amtrak was not envisioned. Amtrak involves the manner, or how

[14] "When any facilities covered by this agreement are taken out of joint service, through retirement or otherwise, the value at which they are included in the rental base shall be deducted therefrom as of the date of such removal from joint service."

[15] The exhibits showed that the rental base was reduced on several occasions, but the record did not specify whether the reductions were brought about by curtailment of passenger service or the retirement of joint facilities.

federal government would allow further reductions, not whether such reductions would occur. The absence of further reductions in rail passenger service by whatever government instrumentality was not a basic assumption of the parties.

The defendant's purpose in making the contract was frustrated by Amtrak's takeover of its passenger service, but the defendant's obligations under the contract are not discharged. The defense of frustration is unavailable because the defendant helped cause the frustrating event and because the parties were aware of the possibility of further reductions in passenger service when the contract was entered into.

*By the Court.*—Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion.

CALLOW, J., took no part.