**In the Matter of FUZZY THURSTON'S LEFT GUARD OF EAU CLAIRE, INC., Debtor.**

**Edward O. LUEDTKE, James A. Hummert and Peyton Muehlmeier, d/b/a Midway Motor Lodge of Eau Claire, a Wisconsin partnership, Plaintiffs,**

**v.**

**FUZZY THURSTON'S LEFT GUARD OF EAU CLAIRE, INC., Defendant.**

**Adv. Proceeding No. 80–0141.**

United States Bankruptcy Court, W. D. Wisconsin.

Nov. 20, 1980.

Schalmo & Congdon, S. C., Richard A. Congdon, Brookfield, Wis., for Edward O. Luedtke, James A. Hummert and Peyton Muehlmeier, d/b/a Midway Motor Lodge of Eau Claire, plaintiff.

Van Metre, Hanson, Clarke & Schnitzler and Roger G. Schnitzler, Madison, Wis., for Fuzzy Thurston's Left Guard of Eau Claire, Inc., defendant.

## OPINION AND ORDER

ROBERT D. MARTIN, Bankruptcy Judge.

The debtor leases and operates a restaurant and lounge in a portion of a motel complex owned and operated by the plaintiff, Midway. The original lease was dated September 27, 1977. On November 1, 1979, the debtor filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. Various disputes between the parties preceded plaintiff's January 31, 1980, application to lift the § 362 stay in order to pursue an eviction action in state court. On April 14, 1980, the stay was lifted by order of this court. The debtor sought rehearing and dissolution of the order lifting the stay and on June 11, 1980, a day prior to a scheduled eviction action, a stipulation between the parties was entered into in open court and became part of the prior lease. The stipulation required that the debtor pay agreed rentals and make specified improvements to the premises within stated times. The improvements included: (1) new carpeting and a new sign were to be on site within 60 days and installed within 90 days (lien waivers for both purchase and installation costs for these items were to be exhibited to plaintiff but no time limit was set); (2) a list of 30 items were to be cleaned and/or repaired within 90 days; and (3) the restaurant was to be kept professionally cleaned to plaintiff's satisfaction. If a default of the stipulation's terms was claimed, the parties limited defenses to "the truth of any of our allegations as to default, except the subjective judgments as to cleanliness, repairs, etc." No mention was made in the stipulation of factors beyond the parties' control, such as an act of God, except the limitation on defenses set out above.

On July 15, 1980, before the expiration of the time periods established in the stipulation, a severe wind and rain storm struck the Eau Claire area. The storm extensively damaged the roofs of both plaintiff and debtor's premises, broke panels out of signs, and interrupted gas and electrical service. Debtor's entire fresh and frozen food inventory was lost due to lack of electricity. The restaurant was closed 2½ days and reopened thereafter on a limited basis due to periodic loss of utility service and reduction of food inventory. Full service resumed after approximately 10 days. During the closing and limited operations, debtor lost considerable general and banquet business and lost the substantial revenues that business would have produced.

By the stipulation debtor agreed to make timely payment of rent due under the lease and to make additional payments to cure its defaults in prior rent. A monthly rental of $10,262.75 was due to Midway from the debtor in August, 1980. At the time the August rent was due, Midway in turn owed the Left Guard 2½ days' rent abatement for the storm period in July and the amount received by Midway for the food charges included on motel room bills during the prior month. The food charges on room bills had been handled in various ways at previous times and there is no evidence that an agreed procedure for making that credit existed at the time the August rent was due.

All payments except the August rent were timely made by the debtor. The debtor sought but was denied by plaintiff a delay in the obligation to pay the August rent. Thereafter debtor separately tendered checks of $890 and $4,232.85 in payment of the August rent and account obligations less credits for rent abatement and room charges, each of which was refused by Midway. The room charges then outstanding were approximately $5,811.00 and the lease rental on a daily basis was approximately $260.00. Thus, although the credits

claimed had not been agreed to, the $4,232.85 tender represented an amount slightly greater than the net figure reached by subtracting room charges and 2½ days rent from the August lease payment. Debtor contends that its failure to pay timely the gross rent and await future repayment of the existing credits due was a result of both uncertainty of the credit procedure and necessity created by reduced cash flow for the period immediately following the storm.

Prior to the storm, minimal efforts were made by the debtor to purchase and install a new sign. After the storm, a new temporary sign was installed and a new permanent sign was ordered. It was not yet installed at time of trial.

Prior to the storm only minimal efforts were made by the debtor to purchase and install new carpeting. Immediately after the storm the debtor had water damage in the restaurant. Roof repairs were made promptly by plaintiff's agents, but minor water leakage continued to trouble the debtor intermittently until 2 weeks prior to trial. The debtor stated this leakage was partially responsible for the carpeting not being installed within the stipulation's time period. New carpeting was ordered in August, on site September 29, and completely installed October 6. No lien waivers for the purchase and installation of the carpet or sign have been exhibited to plaintiff, Midway.

The plaintiff claims that the premises were not repaired or cleaned to their satisfaction as required by the stipulation. Various parties, at a variety of times, worked on the stipulation's list of required cleaning and repairs. Debtor hired a cleaning service in June which it immediately found to be inadequate, but which it failed to replace until the eve of trial. The storm put a premium on cleaning services in Eau Claire, and was therefore, at least indirectly, related to the debtor's failure to clean or repair

the premises within the time stipulated. The cleanliness of the restaurant at the time of trial was as good as most restaurants in Eau Claire. However, it did not meet standards acceptable to Midway.

On August 12, one day after the first stipulated deadline, the plaintiff notified the debtor of the failure to timely complete the terms of the stipulation. Plaintiff filed a petition for turnover of the premises on September 3, 1980. The debtor does not dispute plaintiff's contention that the stipulated times for performance were not met. Rather it claims that the work was all completed within a reasonable time after the storm which made strict timeliness impossible. Plaintiff contends that whatever effect the storm may have had on debtor's business and the availability of services in Eau Claire, debtor's admitted and demonstrated lack of cash throughout the period was the principal reason for debtor's failure to perform as the stipulation required. Debtor in turn contends that the absence of cash was a direct result of the proven loss of business due to the storm and, therefore, supports its claim that performance was made impossible primarily, if not solely, by dint of the weather.

■■■ Historically, impossibility did not excuse performance of a contract unless it was so provided in the contract. This rule has been eroded by exceptions. In order to decide which party will bear the loss in cases of objective supervening impossibility,[1] courts have attempted to determine what risks were contemplated and assumed by each of the contracting parties. As the doctrine has evolved, objective supervening impossibility has enabled discharge of a promisor's performance in a variety of factual contexts. Examples include the death of a necessary party and destruction of necessary equipment or goods. The traditional view did not include acts of God in the same category, but that has changed.

A detailed A.L.R. comment suggests:

1. Supervening impossibility occurs when the performance promised is possible at the time the contract was made, but some new event intervenes to make the performance impossible. Dobbs, *Remedies*, § 13.3, page 966. To be objective impossibility, it must be due to the nature of the act or promise itself, "the thing cannot be done." If the impossibility is personal to the promisor, "I cannot do it," performance will not be excused. 84 A.L.R.2d 12, 29 and 30, quoting Williston on Contracts.

[I]f the event which supervenes and renders performance of the contract actually impossible is an act of God, necessarily beyond the control of the parties, and was not so reasonably foreseeable that the parties should have stipulated regarding it, the impossibility ought to be regarded as having the same effect as fortuitous supervening impossibility arising from other causes. This, in substance, appears to be the more modern rule on the matter. 84 A.L.R. 42.

A similar view is reflected in the RESTATEMENT OF CONTRACTS (1932) which had several sections dealing with impossibility defenses. Section 457 dealing with supervening impossibility states:

> Except as stated in § 455, where, after the formation of a contract facts that a promisor had no reason to anticipate, and for the occurrence of which he is not in contributing fault, render performance of the promise impossible, the duty of the promisor is discharged, unless a contrary intention has been manifested, even though he has already committed a breach of anticipatory repudiation; but where such facts occur after the time when performance of a promise is due, they do not discharge a duty to make compensation for a breach of contract.

(Section 455 deals with subjective impossibility, which is generally not dischargeable.)

Although § 457 has not been explicitly adopted by Wisconsin, the preceding section, 456, dealing with impossibility at the time of contracting has. It states:

> Except as stated in § 455, or where a contrary intention is manifested, a promise imposes no duty if performance of the promise is impossible because of facts existing when the promise is made of which the promisor neither knows nor has reason to know.

Section 456 has been quoted and accepted in three Wisconsin cases: *Estate of Zellmer*, 1 Wis.2d 46, 82 N.W.2d 891 (1957); *Scherrer Constr. Co. v. Burlington Mem. Hosp.*, 64 Wis.2d 720, 221 N.W.2d 855 (1974); and *Chicago, M.S.P. & P.R. v. Chicago & N.W. Transp.*, 82 Wis.2d 514, 263 N.W.2d 189 (1978).

In *Chicago, M.S.R. & P.R., supra*, at footnote 5, page 552, the court states that a contract may also become impossible based on a supervening event. This case, decided on the doctrine of frustration rather than impossibility, explains both concepts, relying on sections of the Restatement of Contracts which had been adopted in previous Wisconsin decisions.

The Restatement (Second) of Contracts, Tentative Draft # 9 (1974), expands defenses based on impossibility. Sections based on frustration and impossibility have been renumbered, rephrased and, in some instances, combined. The term impossible has been replaced by "impracticable." Comment (d) to § 281 explains this change:

> Events that come within the rule stated in this Section are generally due either to "acts of God" or to acts of third parties.... Although the rule stated in this Section is sometimes phrased in terms of "impossibility," it has long been recognized that it may operate to discharge a party's duty even though the event has not made performance absolutely impossible. This Section, therefore, uses "impracticable," the term employed by the Uniform Commercial Code § 2–615(a), to describe the required extent of the impediment to performance. Performance may be impracticable because extreme and unreasonable difficulty, expense, injury, or loss to one of the parties will be involved.

The section applicable here, 281, Discharge By Supervening Impracticability, states:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the nonoccurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

This section clearly applies to situations where there was a change subsequent to the formation of a contract, such as an act of God. This language closely parallels the

language of the Restatement of Contracts on frustration that was adopted by Wisconsin in *Wm. Beaudoin & Sons, Inc. v. Milwaukee County*, 63 Wis.2d 441, 217 N.W.2d 373 (1974).

The proposed Restatement also refers to situations where the impossibility of performance is only temporary. Section 289 states:

Impracticability of performance or frustration of purpose that is only temporary suspends the obligor's duty to perform while the impracticability or frustration exists but does not discharge his duty or prevent it from arising unless his performance after the cessation of the impracticability or frustration would be materially more burdensome than had there been no impracticability or frustration.

The rationale for this section was stated in the Comment to it, (a):

Impracticability of performance or frustration of purpose may be only temporary. While it lasts, the affected party's duty is at least suspended. When the circumstances giving rise to the impracticability or frustration cease to exist, he must then perform. He is usually expected to perform in full and is entitled to an appropriate extension of time for performance.

Although no Wisconsin case has adopted the Tentative Draft which was published in 1974, it seems to demonstrate the direction that the law has taken. It is instructive to observe the introductory note to Chapter 11 of the draft which states:

Even where the obligor has not limited his obligation by agreement, a court may grant him relief. An extraordinary circumstance may make performance so vitally different from what was reasonably to be expected as to alter the essential nature of that performance. In such a case the court must determine whether justice requires a departure from the general rule that the obligor bear the risk that the contract may become more burdensome or less desirable.

The more recent statements of the law appear to allow defendants to claim impossibility or impracticality as available defenses for non-performance of a contract. However, the standard to be met is still a high one. Few of the reported cases where impossibility has been raised and allowed as a possible defense have held that impossibility in fact existed under the factual situation at bar, and all of the cases have required that the impossibility be objective rather than subjective. If the promisor's own acts have caused the impossibility, performance will not be discharged.

■ The remedy sought by the plaintiff is drastic. Termination of the debtor's tenancy will surely end the debtor's business and its efforts to reorganize for the benefit of its creditors. To justify such a drastic remedy the greater equities must lie with the claimant in the context in which the rights are asserted.

■ In the present case, a severe storm struck some 34 days after the stipulation was entered into and 26 days prior to the first specific deadlines for performance. The storm had a direct and significant impact on the debtor's ability to perform timely. The sign which was to be repaired by the replacement of two panels was totally destroyed by the destruction of two additional panels at a time when sign service in the Eau Claire area was overextended in repairing area–wide storm damage. In seeking a replacement sign, the debtor did little prior to the storm or thereafter prior to Frederick Thurston's assuming an active role as the manager of the restaurant on July 28, 1980. Then with the reasonable hope that a new sign could be ordered and installed in a timely fashion, Mr. Thurston sought from various sources and finally obtained a contract to replace the sign. It has been shown that debtor's performance of this term of the stipulation was made temporarily impossible by the intervening storm. That impossibility continued for a considerable time after the storm. Ultimately, the debtor did provide a temporary sign for the location, not later than a similar temporary sign was provided by plaintiff, and moved with reasonable speed to order a permanent sign.

Although new carpeting had not been ordered prior to the storm, initial inquiries had been made with regard to the acceptable quality of carpeting and its availability. Actual steps toward acquisition of the carpeting were not taken until after Mr. Thurston assumed managerial responsibility on July 28, 1980. It is apparent that the change of management had a direct impact on the ordering of the carpeting. However, the economic impact of the storm was an additional factor which delayed the carpet order. In any event, the carpet was delivered and installed by October 6, some 3½ weeks after the installation deadline set by the stipulation. In consideration of the storm's effect on the debtor's business as well as on the physical premises, the delayed installation was in reasonable compliance with the terms of the stipulation.

The efforts extended to repair and clean the premises were begun shortly after the June 11 stipulation. Although apparently inadequate at that time and not diligently pursued thereafter, the repair and cleaning efforts were in fact interrupted and frustrated by the storm. Efforts to improve the cleaning procedures were further hampered by the extreme strain on the meager professional cleaning services available in the Eau Claire area caused by the storm. Although it is apparent that the final cleaning of the premises and repair was not undertaken until this proceeding was commenced, and that the repair was completed during the conduct of the trial, the debtor's ability to perform previously was at least temporarily impaired by the storm's aftermath. Compliance with the essential terms of the stipulation within 1 month after its stipulation deadline is reasonable in light of the supervening storm and its resulting complications.

A reasonable extension of time within which to perform the contract is an appropriate equitable remedy if there is objective supervening impossibility. The Eau Claire storm did create problems for the debtor which warrant such a remedy. Because of the ongoing nature of the cleaning responsibility, extensions are harder to evaluate. However, to the extent that the stipulation was directed toward the accomplishment of certain cleaning and repair, it appears that the initial cleaning and repair has been reasonably provided. That the cleaning efforts do not meet plaintiff's satisfaction is a continuing concern. However, where the community standard has been met and the provisions for future professional cleaning seem facially adequate, it would be inequitable to permit the tenancy to terminate on the failure to meet a subjective standard set by an antagonistic party.

The final provision of the stipulation which is in dispute is the provision for rental payments. All payments required by the stipulation have been made except the August rent for which a partial payment was belatedly tendered. The tendered amount, together with claims and set-offs against Midway, would have substantially equaled the rent due. To the extent that the tendered payment of the August rent failed to conform to the stipulation, it reflected the business interruption caused by the storm. Therefore, the adjustments in credit procedure sought by the tender were reasonable under the circumstances and are not adequate cause for ordering the turnover of the Left Guard restaurant property.

Although this balancing of the equities does not support granting the full relief sought by the plaintiff, it cannot disguise the fact that the debtor's compliance with the stipulation was tardy and in some particulars coincided with the trial of this case. The plaintiff cannot be left with the prospect of dilatory performance condoned in the future. Debtor's continued possession of the subject property must, therefore, be conditioned on strict compliance with the terms of the lease as supplemented by the stipulation.

Upon the foregoing which constitute my findings of fact and conclusions of law in this matter, it is hereby

ORDERED that:

1. Debtor pay the unpaid August rent less any credits agreed to but not yet paid or credited for July rent abatement and July room charges within ten (10) days of the date of this order.

2. Debtor deliver to plaintiff lien waivers for the purchase and installation of the carpeting and the signs within ten (10) days of this order or with regard only to the purchase and installation of the new sign within ten (10) days of such installation, whichever is later.

3. Debtor submit to plaintiff for its approval (which approval shall not be unreasonably withheld) its contract with a professional cleaning contractor for the regular cleaning of the restaurant premises within ten (10) days of the date of this order.

4. Debtor pay within fifteen (15) days of the taxing thereof any of plaintiff's costs in this action noticed within ten (10) days of the date of this order.

IT IS FURTHER ORDERED that upon completion by the debtor of the items above ordered, plaintiff's application for turnover be and hereby is dismissed.