# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.:        2017AP1505

Complete Title of Case:

**CONVENIENCE STORE LEASING AND MANAGEMENT,**

       **PLAINTIFF,**

**BULK PETROLEUM CORPORATION,**

       **PLAINTIFF-APPELLANT,**

       **V.**

**ANNAPURNA MARKETING, BUDDI SEBEDI AND BASUDEV ADHIKARI,**

       **DEFENDANTS-RESPONDENTS.**

| | |
|---|---|
| Opinion Filed: | July 24, 2019 |
| Submitted on Briefs: | April 10, 2018 |

| | |
|---|---|
| JUDGES: | Neubauer, C.J., Gundrum and Hagedorn, JJ. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Matthew W. O'Neill* of *Fox, O'Neill & Shannon, S.C.,* of Milwaukee. |
| Respondent ATTORNEYS: | On behalf of the defendants-respondents Buddi Sebedi and Annapurna Marketing, the cause was submitted on the brief of *Edmund J. Jelinski* of Menasha. |
| | On behalf of defendant-respondent Basudev Adhikari, the cause was submitted on the brief of Kyle Borkenhagen of *Rohde Dales LLP* of Sheboygan. |

COURT OF APPEALS
DECISION
DATED AND FILED

July 24, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2017AP1505**

STATE OF WISCONSIN

Cir. Ct. No. **2015CV656**

**IN COURT OF APPEALS
DISTRICT II**

CONVENIENCE STORE LEASING AND MANAGEMENT,

    PLAINTIFF,

BULK PETROLEUM CORPORATION,

    PLAINTIFF-APPELLANT,

  V.

ANNAPURNA MARKETING, BUDDI SEBEDI AND BASUDEV ADHIKARI,

    DEFENDANTS-RESPONDENTS.

APPEAL from a judgment of the circuit court for Sheboygan County: L. EDWARD STENGEL, Judge. *Reversed and cause remanded with directions*.

Before Neubauer, C.J., Gundrum and Hagedorn, JJ.

¶1 HAGEDORN, J. This case concerns whether frustration of purpose relieved a party of duties under a contract (as the circuit court held), and whether stipulated damages in that contract were an unreasonable and unenforceable penalty. We reverse.

## BACKGROUND

¶2 Annapurna Marketing (AP Marketing) is a real estate holding company created by friends and business partners Buddi Sebedi and Basudev Adhikari to operate gas stations. Bulk Petroleum Corporation is a real estate and petroleum marketing company. In 2003, Bulk purchased a gas station in Sheboygan that is at the center of this dispute. The station ceased operating sometime in 2008 or 2009.

¶3 In June 2012, AP Marketing and Bulk executed two agreements—the first, a land contract to purchase the subject gas station,[1] and the second, a fuel supply agreement (FSA) designed (unsurprisingly) to supply fuel for the station. The FSA, which was personally guaranteed by Sebedi and Adhikari, is the disputed contract on appeal.

¶4 Under the FSA, AP Marketing was required to purchase "all fuel at the Premises" from Bulk. The minimum purchase amount was 15,000 gallons per month, or 180,000 gallons per year. The price per gallon would be 1.5 cents above "the Branded Supplier rack price"—essentially, the per-gallon cost to Bulk

---

[1] Bulk executed the purchase through a real estate holding company called "Convenience Stores Leasing and Management," which is also a plaintiff in this case but not a party to this appeal.

3

plus 1.5 cents. The FSA required Bulk to select a "Branded Supplier"—defined as "a major brand fuel marketer, or any unbranded fuel supplier with credit card processing and related marketing capabilities"—to supply fuel to the station. AP Marketing in turn agreed, without any other evident contractual limitation, that "*any* Branded Supplier selected … by [Bulk] is acceptable." (Emphasis added.) AP Marketing also agreed through the FSA to submit to certain branding requirements that might be imposed by a branded supplier, including compliance "with the image standards set by Branded Supplier." If AP Marketing failed to meet the minimum gallon purchase requirement, the FSA included a stipulated damages provision, which obligated AP Marketing (and again, guaranteed by Sebedi and Adhikari) to pay ten cents per gallon on the shortfall. However, this provision did not apply if the failure to purchase the minimum quantity was due to Bulk's failure to deliver fuel.

¶5    The FSA was supposed to go into effect just ten days after it was signed. But complications arose almost immediately. AP Marketing incurred a number of expenses related to preparing the previously closed station for operation—including obtaining permits for the fuel tanks and tank insurance, replacing the ceiling tiles, fixing problems with the plumbing system, and replacing underground pipes. Replacing the pipes alone cost approximately $35,000–$36,000. Bulk also had difficulty securing a branded supplier.

¶6    Five and one-half months after the FSA was signed, Bulk entered into an agreement with U.S. Oil to supply fuel under the ExxonMobil brand. Like every other supplier contacted by Bulk, U.S. Oil required that AP Marketing update the façade of the station and move the bathroom doors from the exterior to the interior before selling its fuel. The agreement with U.S. Oil required Bulk to purchase a minimum of 480,000 gallons per year, far more than the 180,000 gallon

minimum AP Marketing was required to purchase under the FSA. But Bulk's brand manager explained that he thought the quantity was "a very easy number to hit on a station at this location branded properly."

¶7    The Defendants ultimately decided that the cost to meet U.S. Oil's branding requirements—specifically, the cost of relocating the bathroom entrances—was too steep. By their own admission, they walked away from the land contract and the FSA, without making any payments under the land contract and never having purchased any fuel under the FSA.

¶8    Bulk responded by filing this action, asserting breach of the land contract against AP Marketing and breach of the FSA against AP Marketing, as well as Sebedi and Adhikari based on their personal guarantees. The claims went to a bench trial. The circuit court ultimately concluded that AP Marketing breached the land contract and ordered judgment for $200,000, a determination not before us on appeal.

¶9    On the FSA claim, the circuit court entertained posttrial briefing. AP Marketing, Sebedi, and Adhikari made three arguments. First, they could not be liable for damages under the FSA because Bulk failed to secure a branded supplier who would brand the station without modification—a condition precedent, they insisted, to AP Marketing's obligation to purchase fuel. Second, AP Marketing's performance under the FSA was excused by frustration of purpose. And third, Bulk failed to prove the lost profits it sought as damages. The circuit court agreed with the second argument, concluding that the structural modifications required by U.S. Oil frustrated the principal purpose of the FSA, which "was to open the station and to sell fuel at a profit." The court explained that the requirements placed on AP Marketing by U.S. Oil to make significant

alterations to the premises was the frustrating event. It was a basic assumption, the court reasoned, that the Defendants could "open the station without significant alterations and significant … expense."

¶10 Although it was unnecessary to decide (as the court itself recognized), the court additionally opined that if damages were to be due for breach of the FSA, the stipulated damages provision was an unenforceable penalty.[2] It reasoned that Bulk's actual damages were easily calculable—namely, the 1.5 cent per gallon profit margin under the FSA. The much higher ten cents per gallon figure prescribed by the stipulated damages provision was therefore an unenforceable penalty.

---

[2] The stipulated damages provision provides in full as follows:

> 19. Failure to Purchase Minimum Quantity. Seller shall review the quantity of Fuel sold to Purchaser hereunder every six (6) months during the Initial and any Renewal Term hereof. Unless due to a shortage of supply or a failure by Seller to deliver Fuel, if the average gallonage purchased by Purchaser hereunder during the six (6) month period prior to the review month does not equal or exceed the Minimum Quantity required for such period, then Purchaser shall be required to pay Seller an amount calculated by:
>
> (a) subtracting the actual quantity purchased by Purchaser from Seller during the applicable period from the Minimum Quantity required to be purchased within such time period, and
>
> (b) [m]ultiplying the resulting number (the gallonage shortfall) by $.10 cents.
>
> The parties hereto agree that the payment required hereunder is not a penalty, but is rather a good faith, reasonable estimate of the amount needed to reimburse and make Seller whole in the event of Purchaser's failure to purchase the Minimum Quantity. This payment is in addition to any and all other remedies Seller may have at law or in equity.

¶11    Bulk appeals, and we reverse.

## DISCUSSION

¶12    The main question before us is whether the circuit court correctly concluded AP Marketing's performance under the FSA was excused under the doctrine of frustration of purpose.  We also address the circuit court's conclusion that the stipulated damages provision was an unenforceable penalty.

*A.  Frustration of Purpose*

¶13    The parties profess to disagree over the standard of review, but at the end of the day, they appear to be in heated agreement.  Whether a contract's purpose has been frustrated is best characterized as involving both factual and legal determinations.  We review facts found with deference and legal questions independently.  *See **Wassenaar v. Panos***, 111 Wis. 2d 518, 525, 331 N.W.2d 357 (1983).  The ultimate question of whether a contract's purpose has been frustrated is generally a question of law.  *See **Chicago, Milwaukee, St. Paul & Pac. R.R. Co. v. Chicago & N.W. Transp. Co.***, 82 Wis. 2d 514, 516, 526-28, 263 N.W.2d 189 (1978) (describing the issue as "whether, under the facts described below," the contract's purpose "was frustrated" and reviewing that question without deference to the circuit court's decision); ***Wm. Beaudoin & Sons, Inc. v. Milwaukee Cty.***, 63 Wis. 2d 441, 446-49, 217 N.W.2d 373 (1974) (rejecting the circuit court's "conclusion of law" that the purpose of a contractual term has been substantially

frustrated while deferring to the circuit court's findings of fact).[3]  We see no relevant and disputed issues of fact in this case; the issues presented here are ripe for our independent review.

¶14    Frustration of purpose is a defense to enforcement of a contract; if the elements are met, then a party's obligations under the contract are excused. *See **Chicago, Milwaukee***, 82 Wis. 2d at 522-24; ***Ryan v. Sheppard***, 2010 WI App 105, ¶13, 328 Wis. 2d 533, 789 N.W.2d 616.  The doctrine of frustration is "given a narrow construction" and "applied sparingly."  17A AM. JUR. 2D *Contracts* § 641 (2016).  This is so because it renders null the explicit terms of the contract and is counter to the strong impulse in the law to enforce contracts as written.  ***Id.*** The party asserting the defense has the burden to prove frustration of purpose.  ***Id.***, §§ 632, 640.

¶15    Tracking the RESTATEMENT (SECOND) OF CONTRACTS § 265 (AM. LAW INST. 1981), our cases define the elements of this defense as follows: "(1) the party's principal purposes in making the contract is frustrated; (2) without that party's fault; (3) by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made." ***Sheppard***, 328 Wis. 2d 533, ¶¶12-13 (citation omitted).

¶16    Proving frustration of purpose is generally a tall order.  As the Restatement explains:

---

[3] *See also* RESTATEMENT (SECOND) OF CONTRACTS ch. 11, intro. note (AM. LAW INST. 1981) (explaining that whether frustration of purposes or another "extraordinary circumstance" relieves a party of his or her obligations under a contract "is generally considered to be one of law rather than fact"); 17A AM. JUR. 2D *Contracts* § 640 (2016) ("The excuse of frustration is a question of law, to be determined by the court from the facts of the case.").

> [T]he purpose that is frustrated must have been a principal purpose of that party in making the contract. It is not enough that he had in mind some specific object without which he would not have made the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense.

RESTATEMENT (SECOND) OF CONTRACTS § 265 cmt. a. Moreover, the Restatement and our precedents explain that the frustration must be "substantial." *Id.*; *see also* **Sheppard**, 328 Wis. 2d 533, ¶¶12-13. Frustration of purpose only excuses performance where the frustration is "so severe that it is not fairly to be regarded as within the risks … assumed under the contract." RESTATEMENT (SECOND) OF CONTRACTS § 265 cmt. a. The Restatement affirms that frustration is not substantial merely because "the transaction has become less profitable for the affected party or even that he will sustain a loss." *Id.* An example from the Restatement is helpful and especially pertinent here:

> A leases a gasoline station to B. A change in traffic regulations so reduces B's business that he is unable to operate the station except at a substantial loss. B refuses to make further payments of rent. If B can still operate the station, even though at such a loss, his principal purpose of operating a gasoline station is not substantially frustrated. B's duty to pay rent is not discharged, and B is liable to A for breach of contract. The result would be the same if substantial loss were caused instead by a government regulation rationing gasoline or a termination of the franchise under which B obtained gasoline.

*Id.* at cmt. a, ill. 6.

¶17 Moreover, the frustrating event must strike at the foundation of the contract—a basic assumption on which the contract was made such that the party's performance, due to this unexpected circumstance, would be "virtually worthless" and "meaningless." 17A AM. JUR. 2D *Contracts* § 641. "The doctrine does not apply where the risk of the event that has supervened to cause the alleged

9

frustration was reasonably foreseeable and could and should have been anticipated by the parties and provision made for it in the agreement." *Id.*, § 638.

¶18     Two Wisconsin Supreme Court cases are helpful in understanding the doctrine.  In *Wm. Beaudoin & Sons, Inc.*, Milwaukee County entered into a contract with the plaintiff to do bridge and road work.  However, when it came time for the plaintiff to do certain regrading work, another contractor had already completed the regrading.  *Wm. Beaudoin & Sons, Inc.*, 63 Wis. 2d at 445.  The court concluded that the principal purpose of the regrading term of the contract had been frustrated because "the condition that necessitated [the regrading term in the contract] no longer existed."  *Id.* at 448.  Therefore, the court ruled that because of the intervening event—another contractor performed the work—the plaintiff was discharged from its duty to perform the work and likewise, was not entitled to payment. *Id.* at 448-49.

¶19     In *Chicago, Milwaukee*, our supreme court reversed a circuit court's decision to dismiss a breach of contract claim on the basis of frustration of purpose.  *Chicago, Milwaukee*, 82 Wis. 2d at 528.  The plaintiff and defendant were railroad companies, and the parties had an agreement for joint use of the plaintiff's depot and a certain section of track for their respective passenger lines. *Id.* at 518-19.  Subsequently, both parties contracted with Amtrak to take over their responsibilities for passenger transport in that area.  *Id.* at 519-20.  The circuit court reasoned that the defendant's purpose in making the agreement—to mitigate losses incurred while conducting passenger transport—had been frustrated because it was no longer conducting passenger service.  *Id.* at 524-25.  Although agreeing that the principal purpose had been frustrated, our supreme court rejected use of the defense in part because "the parties were aware of the possibility of further reductions in passenger service when the contract was

10

entered into."[4]  *Id.* at 529.  The court remarked, "It is settled that if the parties have contracted with reference [to the frustrating event] or have contemplated the risks arising from it, they may not invoke the doctrine of frustration."  *Id.* at 527 (citation omitted; alteration in original).  The supreme court concluded that the parties had anticipated potential reductions in passenger service, and therefore the frustrating event (functionally, a reduction in passenger service) did not undermine a basic assumption upon which the contract was made.[5]  *Id.*

¶20    In our case, the parties and the circuit court appear to agree that the alleged frustrating event—U.S. Oil's demand that the Defendants move the bathroom doors and update the façade—happened without the fault of the Defendants (the second element needed to establish frustration).  The contested elements, then, are whether the principal purpose of the FSA was frustrated by the mandated updates, and whether the FSA was made on the basic assumption that these structural changes would not be required.  The Defendants have not met their burden to prove either of these elements.

¶21    The Defendants urge us to affirm the circuit court's conclusion that the principal purpose of the FSA was "to open the station without delay and sell

---

[4]  The court also concluded that the defendant had contributed to the frustrating event by agreeing to relinquish its passenger service.  *Chicago, Milwaukee, St. Paul & Pac. R.R. Co. v. Chicago & N.W. Transp. Co.*, 82 Wis. 2d 514, 516, 529, 263 N.W.2d 189 (1978).

[5]  The court noted the distinction between the contract defense of frustration and the related defense of impossibility, where there is an actual impediment to performance.  *See Chicago, Milwaukee*, 82 Wis. 2d at 521-22.  Here, the parties address only the defense of frustration.

fuel at a profit."[6] They point to a number of facts they believe demonstrate that all parties expected a quick opening of the station, including the fact that fuel purchases were to commence a mere ten days after the land contract was signed. They further argue that Bulk's five-month delay in selecting a supplier played a role in frustrating the purpose of the FSA, which, to reiterate, they believe was to open the station without delay and at a profit. And the Defendants emphasize the substantial cost of moving the bathrooms to the interior, pointing to testimony indicating the alterations "might have cost as much as $30,000."[7] Bulk counters that the Defendants' concerns merely related to lower-than-anticipated profits, which does not constitute substantial frustration of the FSA's principal purpose. Bulk is correct.

¶22    The principal purpose of the FSA (by its own terms) was to supply fuel for sale at the new gas station.[8] The Defendants fail to explain how paying for an updated façade and bathroom modifications frustrated that purpose, much less to the requisite level of severity—such as a personal services contract when the person dies, *see Sheppard*, 328 Wis. 2d 533, ¶¶11-14, or a contract for grading

---

[6] Though separate briefs were filed by AP Marketing and Sebedi on the one hand and Adhikari on the other, the Defendants' arguments largely track each other. In addition to the frustration defense, Adhikari resurrects the condition precedent argument made in the circuit court, arguing that "the branding of the gas station as it was structurally constituted was a condition precedent to the purchase and provision of fuel." Because the circuit court did not need to address or make findings on this issue, we will not consider it in our review. On remand, the circuit court may consider whether it is appropriate to take up the issue.

[7] Adhikari's brief concedes that the cost of remodeling was never specifically determined by the circuit court, but speculates that it "would have certainly cost tens of thousands of dollars." AP Marketing and Sebedi give the more specific estimate of "as much as $30,000."

[8] We point out that the Defendants are *not* arguing that Bulk breached the FSA by imposing burdens not bargained for or contractually required. They are asserting a defense, a reason to be excused from performing under the FSA.

work when the grading is completed by another contractor, *see Wm. Beaudoin & Sons, Inc.*, 63 Wis. 2d at 448-49, or an apartment lease to view a coronation parade when the king falls ill and the parade is cancelled, *see Krell v. Henry*, 2 K.B. 740 (C.A. 1903) (cited and discussed with approval in *Chicago, Milwaukee*, 82 Wis. 2d at 522-23). If the cost was so high that the principal purpose was defeated, the Defendants inexplicably failed to develop a record in support. As noted, the evidence relating to the estimated cost for bathroom modifications was not especially specific or certain. And even if we used, for the sake of argument, the highest estimate mentioned—$30,000—we are given no basis to determine this amount is prohibitive within the context of a commercial property sold for $200,000 and expected to sell a minimum of 180,000 gallons annually for ten years. Further, as the authorities note, reduced profitability, or even outright financial losses, are insufficient by themselves to prove a frustrated purpose. *See* RESTATEMENT (SECOND) OF CONTRACTS § 265 cmt. a. To paraphrase an example from the Restatement, "If [AP Marketing] can still operate the station, even though at … a loss, [its] principal purpose of operating a gasoline station is not substantially frustrated."[9] *Id.* at cmt. a., ill. 6.

¶23 The Defendants also did not carry their burden to show that a "basic assumption" of the FSA was that no modifications to the station would be required. It was not a fundamental premise of the FSA to open the station and sell fuel as the station was presently constituted. In fact, the FSA expressly vested

---

[9] AP Marketing also points to the delay in Bulk's selection of a supplier as evidence of a frustrated purpose. Again, AP Marketing's argument fails for a lack of proof. To be sure, delays are rarely preferred, but AP Marketing does not show how the mere passing of time defeated its ability to sell, albeit later than expected, fuel at the station.

Bulk with the discretion to select a supplier of its choice, deeming "any Branded Supplier" Bulk selected "acceptable." By entering into the FSA, AP Marketing agreed to certain branding requirements, including compliance "with the image standards set by Branded Supplier." That the chosen supplier would have image standards made it highly likely, if not inevitable, that some modifications to the station would be required. As our supreme court stated in *Chicago, Milwaukee*, "if the parties have contracted with reference [to the frustrating event] or have contemplated the risks arising from it, they may not invoke the doctrine of frustration." *Chicago, Milwaukee*, 82 Wis. 2d at 527. While the modifications may have been more expensive than AP Marketing had hoped, costs that are unwanted or higher than expected are not the same as ones that are unforeseeable, the non-occurrence of which underlie the making of the deal.[10] *Id.* at 526 (foreseeability is not dispositive, but it is a factor). Defendants have failed to establish that opening and operating the station in a nearly "as is" condition was not "so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense." RESTATEMENT (SECOND) OF CONTRACTS § 265 cmt. a.

¶24 In short, the Defendants have not met their burden to prove that the principal purpose of the FSA was frustrated due to U.S. Oil's demand for alterations to the bathrooms, nor that this demand was contrary to a basic assumption underlying the FSA.

---

[10] The contention that a basic assumption of the FSA was that the station would require little to no up-front expenses is further belied by the reality that this station had been closed for three to four years and, in this regard, AP Marketing did spend significant money in up-front repairs. The record suggests the bathroom updating was a bridge too far for their business model, not that the FSA itself was premised on no upgrade costs.

### B. Stipulated Damages

¶25    Although it was unnecessary to decide (because the Defendants were relieved of their contractual obligations in toto following the circuit court's frustration of purpose holding), the circuit court nonetheless opined that the FSA's stipulated damages provision was an unenforceable penalty.  Due to the abbreviated nature of the circuit court's comments, it is difficult to determine what facts were found with respect to this issue.  But in light of the circuit court's on-the-record discussion and stated legal conclusion, we nevertheless offer some guidance for consideration on remand.

¶26    The validity of a stipulated damages provision is a question of law, "[b]ut a trial court's decision concerning the validity or invalidity of [such a provision] involves factual and legal determinations." *Koenings v. Joseph Schlitz Brewing Co.*, 126 Wis. 2d 349, 358, 377 N.W.2d 593 (1985).  We defer to the court's factual findings under the clearly erroneous standard of review.  *Id.*  The ultimate question of whether the facts, as found, meet the legal standard is a question of law, although the circuit court's decision "should be given weight" because "the factual and legal determinations are intertwined." *Id.*

¶27    Provisions stipulating damages upon breach may be divided into "liquidated damages" provisions (which are reasonable and enforceable) and "penalty clauses" (which are "unreasonable and unenforceable"). *Equity Enters., Inc. v. Milosch*, 2001 WI App 186, ¶18, 247 Wis. 2d 172, 633 N.W.2d 662.  The test to determine whether a stipulated damages provision is enforceable is "whether the clause is reasonable under the totality of the circumstances," and the party seeking to avoid enforcement of the bargain struck bears the burden to show the clause is unreasonable. *Id.*, ¶19; *Wassenaar*, 111 Wis. 2d at 526.  This "test

ensures that the court respects the parties' bargain, but prevents abuse." ***Equity Enters., Inc.***, 247 Wis. 2d 172, ¶19.  To determine reasonableness, we consider the following factors:

> (1) whether the parties intended to provide for damages or for a penalty; (2) whether the injury caused by the breach would be difficult or incapable of accurate estimation at the time of entering into the contract; and (3) whether the stipulated damages are a reasonable forecast of the harm caused by the breach.[11]

***Rainbow Country Rentals & Retail, Inc. v. Ameritech Publ'g, Inc.***, 2005 WI 153, ¶28, 286 Wis. 2d 170, 706 N.W.2d 95.

¶28    "In addition to these factors, we also consider the policies underlying the reasonableness test."  ***Id.***, ¶¶29-30.  One of those policies is the parties' freedom to contract and allocate risk as they see fit.

> [Stipulated damages] clauses allow the parties to control their exposure to risk by setting the payment for breach in advance.  They avoid the uncertainty, delay, and expense of using the judicial process to determine actual damages. They allow the parties to fashion a remedy consistent with economic efficiency in a competitive market, and they enable the parties to correct what the parties perceive to be inadequate judicial remedies by agreeing upon a formula which may include damage elements too uncertain or remote to be recovered under rules of damages applied by the courts.  In addition to these policies specifically relating to stipulated damages clauses, considerations of judicial economy and freedom of contract favor enforcement of stipulated damages clauses.

---

[11] These factors are not to be applied mechanistically and "courts may give some factors greater weight than others." ***Rainbow Country Rentals & Retail, Inc. v. Ameritech Publ'g, Inc.***, 2005 WI 153, ¶28, 286 Wis. 2d 170, 706 N.W.2d 95 (citation omitted).

*Wassenaar*, 111 Wis. 2d at 528. "A competing set of policies disfavors stipulated damages clauses." *Id.* Public law ordinarily determines the parties' remedies, and stipulated damages are an exception to this rule. *Id.*

> Stipulated damages allow private parties to perform the judicial function of providing the remedy in breach of contract cases, namely, compensation of the nonbreaching party, and courts must ensure that the private remedy does not stray too far from the legal principle of allowing compensatory damages. Stipulated damages substantially in excess of injury may justify an inference of unfairness in bargaining or an objectionable *in terrorem* agreement to deter a party from breaching the contract, to secure performance, and to punish the breaching party if the deterrent is ineffective.

*Id.* at 528-29. Accordingly, we do not "blindly" enforce stipulated damages clauses without first scrutinizing them. *Id.* at 528.

¶29 The circuit court here noted that it would have been "very easy" to calculate the anticipated damages based on the "one-and-a-half cents a gallon above ... the rack rate." Thus, the court opined that that stipulated damages provision in the FSA of ten cents per gallon "constitute[d] a penalty, not a fair and accurate assessment of damages incurred on behalf of the plaintiff." The Defendants echo this position.

¶30 However, this may be an incomplete account of the potential damages that could result from a breach by AP Marketing and the difficulty in calculating them. Bulk asserts that it is entitled to lost profits and incidental damages if it proves a breach. *See* WIS. STAT. §§ 402.708(2), 402.710 (2017-18). A stipulated damages provision may properly seek to account for "damage elements too uncertain or remote to be recovered under rules of damages applied by the courts." *See Wassenaar*, 111 Wis. 2d at 528. Here, the FSA expressly contemplated that Bulk would contract with a fuel supplier to provide for the

Defendants' fuel needs, and Bulk is free to argue that such obligations under the FSA carried additional risk. A calculation of damages limited to the 1.5 cent per gallon profit margin for the 180,000 gallons AP Marketing agreed to purchase under the FSA may not fully take into account Bulk's recoverable damages sustained as a result of a breach.[12]

**CONCLUSION**

¶31    We conclude AP Marketing is not excused from performance of the FSA under the frustration of purpose doctrine. The circuit court erroneously dismissed the claim on this ground. We remand the case to the circuit court with instructions to reinstate Bulk's claim that AP Marketing breached the FSA. Because the circuit court did not determine whether AP Marketing breached the FSA, that issue—along with any other issues of contractual interpretation and performance, including the stipulated damages provision—remains to be adjudicated.

*By the Court.*—Judgment reversed and cause remanded with directions.

---

[12] The parties have noted other language and provisions in the FSA that may affect the damages analysis, such as the last line of the stipulated damages provision, which states that "[t]his payment is in addition to any and all other remedies [Bulk] may have at law or in equity."