RAINBOW COUNTRY RENTALS AND RETAIL, INC., d/b/a
Oconomowoc Rental Center, Plaintiff-Appellant,

v.

AMERITECH PUBLISHING, INC., d/b/a Ameritech
Advertising Services, Defendant-Respondent.

Supreme Court

*No. 2004AP239. Oral argument September 7, 2005.
—Decided November 22, 2005.*

2005 WI 153

(Also reported in 706 N.W.2d 95.)

For the plaintiff-appellant there were briefs (in the court of appeals and the supreme court) by *Jonathan P. Groth* and *Pitman, Kyle & Sicula, S.C.,* Milwaukee, and oral argument by *Jonathan P. Groth.*

For the defendant-respondent there were briefs (in the court of appeals and the supreme court) by *Terry E.*

*Johnson, Peter F. Mullaney* and *Peterson, Johnson & Murray, S.C.,* Milwaukee, and oral argument by *Terry E. Johnson.*

¶ 1. JON P. WILCOX, J. This case comes to us on certification from the court of appeals. The appellant, Rainbow Country Rentals and Retail, Inc., d/b/a Oconomowoc Rental Center (Rainbow), appealed an order of the Circuit Court for Waukesha County, Lee S. Dreyfus, Jr., Judge, granting summary judgment to Ameritech Publishing, Inc., d/b/a Ameritech Advertising Services (API).

## I. ISSUE

¶ 2. The court of appeals certified the following question: Whether this court's holding in *Discount Fabric House of Racine, Inc. v. Wisconsin Telephone Co.,* 117 Wis. 2d 587, 345 N.W.2d 417 (1984), that an exculpatory clause in a yellow pages advertising contract was unconscionable as against public policy is still viable today given the changes that have occurred in the telecommunications industry in the two decades since that decision.

¶ 3. We conclude that *Discount Fabric* is still viable today. However, the case presented to us is factually distinct from *Discount Fabric* in two important ways. First, Ameritech does not possess a monopoly as Wisconsin Telephone did when *Discount Fabric* was decided. Second, when comparing all of the circumstances of this case with *Discount Fabric,* the clause at issue is not exculpatory, but rather, a valid and enforceable stipulated damages clause. Therefore, we affirm the circuit court's grant of summary judgment in favor of API.

174

## II. FACTUAL BACKGROUND
## AND PROCEDURAL POSTURE

¶ 4. On August 8, 1999, Rainbow contracted with API for the listing of its business in the November 1, 1999, edition of the Oconomowoc and Waukesha Ameritech Pages Plus Yellow Pages telephone directories, in addition to the May 1, 2000, edition of the Watertown Ameritech Pages Plus Yellow Pages telephone directory. API subsequently omitted Rainbow's entire listing from each of the directories.

¶ 5. On January 7, 2002, Rainbow filed a complaint against API in the Circuit Court for Waukesha County alleging breach of contract and negligence for business losses resulting from API's omission of Rainbow's advertisement in the directories. As an affirmative defense, API contended that if a contract did exist between the parties, the contract contained a liquidated damages provision limiting the liability of API on the contract. This provision reads as follows:

> 8. ERRORS IN OR OMISSIONS OF ADVERTISING SOMETIMES OCCUR. ANY ERRORS OR OMISSIONS MUST BE REPORTED TO US WITHIN ONE HUNDRED TWENTY (120) DAYS AFTER THE ISSUE DATE OF THE DIRECTORY; OTHERWISE, WE WILL HAVE NO LIABILITY TO YOU. IN ORDER TO MAINTAIN OUR PRICING SCHEDULES, WE CANNOT AND DO NOT ACCEPT LIABILITY FOR LOST PROFITS OR FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF ERRORS OR OMISSIONS. WE ARE ALSO NOT RESPONSIBLE FOR ERRORS OR OMISSIONS CAUSED BY ACTS OF GOD, GOVERNMENTAL AUTHORITY OR OTHER ACTS BEYOND OUR REASONABLE CONTROL. IF AN ERROR OR OMISSION SHOULD OCCUR, UNLESS A GREATER LIMIT TO OUR LIABIL-

ITY HAS BEEN AGREED TO BY US IN WRITING FOR WHICH YOU HAVE AGREED TO PAY ADDITIONAL CHARGES FOR OUR TAKING A GREATER RISK OF LOSS, YOU AGREE THAT THE FOLLOWING MAXIMUM ADJUSTMENTS TO THE INVOICED AMOUNTS WILL APPLY AS A FINAL RESOLUTION:

a. All other content errors (other than those specified in this paragraph). . . . 10%

b. Incorrect spelling of a word (other than business name). . . . 10%

c. Incorrect sequencing of display advertisement. . . . 20%

d. Wrong alternate phone number, e-mail address or other identification. . . . 25%

e. Incorrect spelling of a business name. . . . 65%

f. Wrong address. . . . 65%

g. Wrong primary telephone number. . . . 100%

h. Complete omission of an advertising unit. . . . 100% plus a future PAGESPLUS advertising credit of like amount

i. Wrong color. . . . amount invoiced for the requested color

j. No adjustments will be made on advertising units (either display or listing) which were free to you or for which no charge was made or invoiced.

UNDER NO CIRCUMSTANCES (1) WILL OUR LI-
ABILITY FOR ANY ADVERTISING UNIT EXCEED
THE AMOUNT YOU HAVE ACTUALLY PAID FOR IT
TOGETHER WITH FUTURE PAGESPLUS ADVER-
TISING CREDIT OF LIKE AMOUNT NOR (2) WILL
WE HAVE ANY OBLIGATION TO RECALL,
SUPPLEMENT OR OTHERWISE AMEND DIREC-
TORIES.

¶ 6. Prior to the omissions, Frank Paoletti, an
API representative, and Kim Gradinjan, one of
Rainbow's co-owners, signed an Ameritech Customer
Receipt. The document consisted of a front and back
page. The front page listed the directories that
Rainbow's advertisement was to appear in, along with
the monthly charge for each advertisement. The back
page listed the terms of the agreement. Immediately
above the signature line on the front page, the contract
included the following language:

> I HAVE READ AND UNDERSTAND THE TERMS
> AND CONDITIONS ON THE FACE AND REVERSE
> SIDE, PARTICULARLY THE PARAGRAPH WHICH
> LIMITS MY REMEDIES AND PUBLISHER'S MAXI-
> MUM LIABILITY IN THE EVENT OF ANY ERROR
> OR OMISSION.

¶ 7. Rainbow does not dispute that the omitted
advertising was subject to the contract. Furthermore,
Rainbow admitted that Gradinjan signed the contract
and read the contract prior to signing it.

¶ 8. On June 2, 2003, API filed a partial summary
judgment motion to limit the contract damages to the
amount set forth in the schedule of potential damages
within the contract and to dismiss the negligence claim.
In response, Rainbow argued that the damage limita-
tion provision was void and unenforceable under this
court's decision in *Discount Fabric,* 117 Wis. 2d 587.

Additionally, Rainbow conceded that the economic loss doctrine barred its negligence claim, and it agreed to dismiss that cause of action.

¶ 9. In support of its motion, API submitted an affidavit from Craig Cerqua, one of API's Wisconsin regional marketing managers. Cerqua made the following pertinent assertions: (1) API's competitors, including USXchange and Yellow Book USA, publish their own version of yellow pages telephone directories in all of the major directory markets throughout Wisconsin; (2) Beginning approximately 20 years ago, companies such as Community Directories, Inc. (which was purchased by Sprint in the early 1990s and is now known as Yellow Book USA), have competed with API in most of the major directory markets throughout Wisconsin; (3) Since 1998, USXchange has annually published the "Milwaukee One Book" covering the greater Milwaukee metropolitan area; (4) Consumers in the Waukesha area consulted API's competitors 9 percent of the time in 1998, compared to 41 percent of the time in 2002; (5) Consumers in the Milwaukee area consulted API's competitors four percent of the time in 1998, compared to 33 percent of the time in 2002; (6) For several years, USXchange has invested substantial sums of advertising money in various media outlets; and (7) Yellow pages directories are available on the Internet, and several competitors currently publish such information on the Internet.

¶ 10. In response, Rainbow submitted the affidavit of Frank Paoletti, API's representative to the transaction. Paoletti made the following assertions: (1) Although other books sold ads that were distributed throughout the relevant areas, there was no other book that had the depth of distribution comparable to that of API's publication; (2) API had no real competitors in

the market during the relevant time frame; and (3) During the negotiations with Rainbow, he was not authorized to change the terms of the contract between the parties.

¶ 11. On August 4, 2003, the circuit court issued an oral decision and order granting API's motion for partial summary judgment, which effectively enforced the terms of the contract as stated. The court determined that the circumstances that existed when *Discount Fabric* was decided were significantly distinguishable from the circumstances that are present in this case. The court recognized that during the relevant time frame in *Discount Fabric,* Wisconsin Telephone had a monopoly on local telephone service; there were no other service options available to the plaintiff in Racine in 1978. In contrast, Rainbow had other local telephone service providers and other yellow pages providers available to take its business. Furthermore, the court determined that the provisions of API's advertising contract were clearly stated on a one-page, two-sided document. The court also noted that these kinds of business contracts where the parties stipulate to the damages in the event some kind of harm occurs have been approved by the courts with great regularity. Thus, under all the circumstances, the court determined that API's contract was not unconscionable as against public policy.

¶ 12. On November 4, 2003, the court entered its written order for summary judgment, and on January 28, 2004, Rainbow was awarded $5253 (100 percent of the annual cost of the omitted ads), together with taxable costs. Rainbow appealed, and the court of appeals certified the aforementioned question to this court.

179

## III. STANDARD OF REVIEW

■■■■

¶ 13. This case comes before us on summary judgment. "We review a circuit court's grant of summary judgment independently, applying the same methodology as the circuit court." *Smaxwell v. Bayard,* 2004 WI 101, ¶ 12, 274 Wis. 2d 278, 682 N.W.2d 923 (citing *Town of Delafield v. Winkelman,* 2004 WI 17, ¶ 15, 269 Wis. 2d 109, 675 N.W.2d 470). Pursuant to Wis. Stat. § 802.08(2) (2003–04), summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "We view the summary judgment materials in the light most favorable to the nonmoving party." *Smaxwell,* 274 Wis. 2d 278, ¶ 12 (citing *Torgerson v. Journal/Sentinel, Inc.,* 210 Wis. 2d 524, 537, 563 N.W.2d 472 (1997)). "Summary judgment should not be granted, 'unless the facts presented conclusively show that the plaintiff's action has no merit and cannot be maintained.' " *Id.* (quoting *Goelz v. City of Milwaukee,* 10 Wis. 2d 491, 495, 103 N.W.2d 551 (1960)). "Where the material facts are not disputed, the court is presented solely with a question of law, subject to de novo review." *Id.* (citing *Winkelman,* 269 Wis. 2d 109, ¶ 16).

## IV. ANALYSIS

¶ 14. Rainbow challenges the circuit court's decision regarding partial summary judgment. Rainbow essentially contends that *Discount Fabric* is exactly on point with the facts of this case, and therefore, it should control our decision. We do not reach the same conclusion.

¶ 15. In *Discount Fabric,* 117 Wis. 2d at 589, Wisconsin Telephone omitted the plaintiff's trade name from its advertisement in the 1978 Racine yellow pages after correctly printing the same ad for three consecutive years. The plaintiff sued for damages, and the telephone company raised as a defense the following clause from the form contract that the telephone company used for all of its yellow pages advertising sales: "Applicant agrees that the Telephone Company shall not be liable for errors or omissions (including total omissions) in directory advertising beyond the applicable charges for the item or items in which errors or omissions occur for the issue life of the directory involved." *Id.*

¶ 16. The court determined that the above clause made the contract exculpatory in nature.[1] *Id.* at 590–91.

> A clearer example of a take-it-or-leave-it transaction is hard to imagine. The only way Discount Fabric House could purchase a display ad in the yellow pages was to sign a standard form contract provided by the telephone company. Although there are "yellow pages" published by independent publishers, the telephone company's yellow pages is the only one distributed to everyone with a telephone.

*Id.* at 591.

¶ 17. The court noted that Wisconsin Telephone possessed "a decisive advantage of bargaining strength." *Id.* at 594. At the time of the decision, Wisconsin Telephone was a monopoly subject to regulation by the Public Service Commission. *Id.* at 593. The court recog-

---

[1] Despite the wealth of authority from other jurisdictions that treated yellow pages advertising "as a matter of private contract under which the parties may validly limit their liability[,]" the court refused to adopt this rationale. *Discount Fabric House of Racine, Inc. v. Wisconsin Telephone Co.,* 117 Wis. 2d 587, 592, n.1, 345 N.W.2d 417 (1984) (citing 19 cases).

nized that Wisconsin Telephone had "an exclusive private advertising business which, if not legally monopolistic, is tied to its public utility service of providing telephone service." *Id.* at 594. The court went on to state that "[t]here is nothing in this record to show that there is any other mode of advertising available to Discount Fabric House which reaches as many customers, is of a similar nature as the yellow pages, and is inexorably tied to the telephone service." *Id.* Furthermore, the parties made two important stipulations. First, "none of the telephone company's employees or agents had the authority to alter any of the terms or provisions of the standard contract, nor had they ever done so." *Id.* at 589. Second, "[t]he parties also stipulated that there was never any bargaining on either price or terms with any advertiser; each subscriber in the Racine directory paid exactly the same for the same size listing or advertisement." *Id.* at 589–90. For all of these reasons, the court determined that Discount Fabric House had a significant disadvantage in bargaining strength.

¶ 18. Ultimately, the court held that the exculpatory contract was contrary to public policy and, therefore, unconscionable and unenforceable. *Id.* at 604.

> This exculpatory clause in this private contract is against public policy in that the parties are not on equal bargaining terms and the telephone company has created a public interest in the publication of the yellow pages which requires that the telephone company perform its private duty to the ad subscriber without negligence or be held for damages.

*Id.* at 600.

¶ 19. Despite the similarities between *Discount Fabric* and this case, there are important distinctions that lead us to a different result in 2005 than we reached in 1984. First, there is no longer a state-approved mo-

nopoly. Second, the clause at issue in this case is a stipulated damages clause and not an exculpatory clause.

A.

¶ 20. The divestiture of AT&T on January 1, 1984, was a watershed moment in the telecommunications industry. The divestiture originated from an antitrust suit filed by the United States Department of Justice, which primarily charged that "AT&T violated antitrust laws by making it difficult or costly for competing long distance carriers to interconnect with AT&T's local Bell subsidiaries." Legislative Council Staff Brief 84–11, at 27 (Aug. 29, 1984). As a result, AT&T was required to divest its 22 wholly-owned Bell operating companies, including Wisconsin Bell. *Id.* Seven new regional holding companies were created out of the AT&T divestiture. *Id.* at 28. Wisconsin Bell became a wholly-owned subsidiary of the Midwest regional holding company, Ameritech. *Id.* Furthermore, on July 19, 1984, the Public Service Commission (PSC) approved Wisconsin Bell's transfer of the publication of its yellow pages to Ameritech. *Id.* at 42.

¶ 21. On April 25, 1986, the Wisconsin Legislature enacted Wis. Stat. §§ 196.194 and 196.195, which partially deregulated telecommunications services in the state. 1985 Wis. Act 297; *see also MCI Telecomms. Corp. v. Pub. Serv. Comm'n of Wis.,* 164 Wis. 2d 489, 492, 476 N.W.2d 575 (Ct. App. 1991) (stating that the new law "permitted telecommunication utilities to enter into individual contracts with individual customers"). The Legislative Council recognized that "[t]he telecommunications industry currently is in a state of transition. The industry is moving from a system of a single monopoly provider of telecommunications services in an area to a system of competition, with multiple

providers of services in an area." Legislative Council Information Memorandum 86–11, at 3 (May 7, 1986). Furthermore, the Council noted that "it is the Legislature's stated intent that the PSC shall, when consistent with the protection of ratepayers and with other public interest goals established by the Legislature, rely on competition rather than regulation to determine the variety, quality and price of telecommunications services." *Id.* at 4. *See also* 1985 Wis. Act 297, § 1.

¶ 22. Congress subsequently passed the Telecommunications Act of 1996, Pub. L. No. 104–104, 110 Stat. 56 (codified at 47 U.S.C. §§ 151–612) into law. The Act's overarching purpose was to "transition the entire industry from regulated monopoly to unregulated competition." Peter W. Huber et al., *Federal Telecommunications Law* § 1.9 (2d ed. 1999); *see also* Reza Dibadj, *Competitive Debacle in Local Telephony: Is the 1996 Telecommunications Act to Blame?,* 81 Wash. U. L.Q. 1, 2 (2003) (stating that "the 111–page statute boasted the ambitious goal 'to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers . . . .' " (quoting § 502, 110 Stat. at 56)). The core of the Act "focused on breaking the monopoly of the incumbent local exchange carriers (ILECs)—more specifically, the regional Bell operating companies (RBOCs) [such as Ameritech] and promoting competition in local telephony." Dibadj, *supra,* at 2.

¶ 23. The passage of these various state and federal laws demonstrates that the industry as it existed in 1999 was not the same as it was when *Discount Fabric* arose. The barriers to competition in the telecommunications industry prior to these legislative enactments are no longer prevalent. Indeed, as one treatise notes:

Since divestiture, there has been a steady, inexo-

rable rise in competition in all levels of the industry. MCI and Sprint developed into full-fledged national carriers to compete with AT&T; other, smaller carriers built regional networks, and hundreds of resellers entered the market, too. Unexpected though it was by the framers of the decree, competition began to emerge in local markets, too, particularly in the business of providing "exchange access service," i.e., the local transport of calls to the nearest "point of presence" of a long-distance carrier.

Huber et al., *supra,* § 1.9.2.

¶ 24. In sum, in 1999, after the divestiture of AT&T, the passage of 1985 Wisconsin Act 297, and the passage of the Telecommunications Act of 1996, there was not a single telephone company with "an exclusive private advertising business" that published a directory that was "inexorably tied to the telephone service." *Discount Fabric,* 117 Wis. 2d at 594. Indeed, there were numerous competitive local, long distance, and to a lesser degree, cellular carriers. Furthermore, as detailed in Craig Cerqua's affidavit, there were competitive directory publishers competing with API in the relevant markets. As such, the rationale behind much of *Discount Fabric* is simply not applicable to this case.

B.

¶ 25. As already discussed, this court determined that the contract clause at issue in *Discount Fabric* was exculpatory in nature and unenforceable as a matter of public policy. Although the contractual language and the surrounding circumstances of the agreement are similar in *Discount Fabric* and this case, the clause at

issue here is not an invalid exculpatory clause, but rather a valid stipulated damages clause.[2]

¶ 26. In *Merten v. Nathan*, 108 Wis. 2d 205, 210, 321 N.W.2d 173 (1982), this court defined exculpatory contracts as "contracts which relieve a party from liability for harm caused by his or her own negligence." *See also Discount Fabric*, 117 Wis. 2d at 591 (quoting the same language). The contract between Rainbow and API does not meet this operational definition of an exculpatory agreement. The contract restricts Rainbow's recoverable damages, but it does not release API from liability. Under the express terms of the contract, Rainbow is entitled to all or a portion of the cost of advertisement following an error or omission. Additionally, because API completely omitted Rainbow from its directories, Rainbow is entitled to a future PAGESPLUS advertising credit of like amount.[3]

¶ 27. Rainbow argues that it had no opportunity to bargain because Frank Paoletti, the API salesman

---

[2] The clause could also rightly be termed a "liquidated damages" clause, a "limited liability" clause or a "limitation of damages" clause. We elect to use the term " 'stipulated damages' to mean the damages specified in the contract" and the term " 'liquidated damages' to mean reasonable and enforceable stipulated damages." *See Kernz v. J.L. French Corp.*, 2003 WI App 140, ¶ 28, 266 Wis. 2d 124, 667 N.W.2d 751 (citing *Wassenaar v. Panos*, 111 Wis. 2d 518, 521, 331 N.W.2d 357 (1983)).

[3] We recognize that under *Discount Fabric*, returning only the contract price or a portion of it does not, by itself, alleviate the exculpatory nature of some contract clauses. *Discount Fabric*, 117 Wis. 2d at 591. Although not the sole reason for distinguishing the clauses in these cases, we note that in this instance Rainbow was entitled to a free year of advertising, worth $5253, under the terms of the contract. It is unclear from the record why Rainbow's judgment does not reflect these additional damages.

who sold Rainbow its advertisements, was not authorized to change the terms of the contract. This statement by Paoletti, however, is belied by the express terms of the contract. Under the ninth paragraph of the terms and conditions section, the contract states:

> This document is our complete agreement. It replaces and supersedes (and you should not rely upon) any prior oral or written representations or agreements. IF YOU WISH TO NEGOTIATE ANY ONE OR MORE DIFFERENT TERMS THAN THOSE ABOVE, INCLUDING HIGHER LIABILITY LIMITS, YOU MAY DO SO. However, any change to this document or to these terms must be in writing, signed by both you and us, and dated by both you and us at least fourteen (14) weeks prior to the Issue Date of the directory.

(Capitalization in original.) Thus, it is irrelevant if Paoletti was not authorized to change the terms of the contract. The contract afforded Rainbow the opportunity to negotiate higher stipulated damages than those that are usually offered by API. However, Rainbow decided not to do so, and as API has noted, almost none of their customers negotiate to increase the amount of stipulated damages in exchange for a higher advertising rate, because no one enters into these contracts believing their advertisement is going to be left out of API's yellow pages.

¶ 28. We next turn to the question of whether the stipulated damages clause is a valid and enforceable provision for liquidated damages. "[A] trial court's decision concerning the validity or invalidity of a clause involves factual and legal determinations, and they will be reviewed as such." *Koenings v. Joseph Schlitz Brewing Co.*, 126 Wis. 2d 349, 358, 377 N.W.2d 593 (1985) (citing *Wassenaar v. Panos*, 111 Wis. 2d 518, 525, 331

N.W.2d 357 (1983)). "The overall single test of validity is whether the clause is reasonable under the totality of circumstances." *Wassenaar,* 111 Wis. 2d at 526 (citations omitted); *see also Westhaven Assocs., Ltd. v. C.C. of Madison, Inc.,* 2002 WI App 230, ¶ 17, 257 Wis. 2d 789, 652 N.W.2d 819. To determine reasonableness, we consider: (1) whether the parties intended to provide for damages or for a penalty; (2) whether the injury caused by the breach would be difficult or incapable of accurate estimation at the time of entering into the contract; and (3) whether the stipulated damages are a reasonable forecast of the harm caused by the breach. *Wassenaar,* 111 Wis. 2d at 529–30. "Essentially, we must look at both the 'harm anticipated at the time of contract formation and the actual harm at the time of breach.' " *Kernz v. J.L. French Corp.,* 2003 WI App 140, ¶ 30, 266 Wis. 2d 124, 667 N.W.2d 751 (quoting *Wassenaar,* 111 Wis. 2d at 532). " 'The factors are not meant to be mechanically applied, and courts may give some factors greater weight than others.' " *Id.* (quoting *Westhaven,* 257 Wis. 2d 789, ¶ 17); *see also Koenings,* 126 Wis. 2d at 361–62.

¶ 29. In addition to these factors, we also consider the policies underlying the reasonableness test. In *Wassenaar,* we noted the many reasons that support the enforcement of stipulated damages clauses between private parties:

> The clauses allow the parties to control their exposure to risk by setting the payment for breach in advance. They avoid the uncertainty, delay, and expense of using the judicial process to determine actual damages. They allow the parties to fashion a remedy consistent with economic efficiency in a competitive market, and they enable the parties to correct what the parties perceive

to be inadequate judicial remedies by agreeing upon a formula which may include damage elements too uncertain or remote to be recovered under rules of damages applied by the courts. In addition to these policies specifically relating to stipulated damages clauses, considerations of judicial economy and freedom of contract favor enforcement of stipulated damages clauses.

*Wassenaar,* 111 Wis. 2d at 528.

¶ 30. Alternatively, the competing policies that disfavor stipulated damages were detailed in *Wassenaar* as follows:

> Public law, not private law, ordinarily defines the remedies of the parties. Stipulated damages are an exception to this rule. Stipulated damages allow private parties to perform the judicial function of providing the remedy in breach of contract cases, namely, compensation of the nonbreaching party, and courts must ensure that the private remedy does not stray too far from the legal principle of allowing compensatory damages. Stipulated damages substantially in excess of injury may justify an inference of unfairness in bargaining or an objectionable *in terrorem* agreement to deter a party from breaching the contract, to secure performance, and to punish the breaching party if the deterrent is ineffective.

*Id.* at 528–29.

¶ 31. In this case, we do not give much weight to the first factor—did the parties intend to provide for damages or for a penalty—as "what the parties intended in fact in creating the stipulated damages clause has little relevance to what is reasonable in law." *Koenings,* 126 Wis. 2d at 362. However, we note that immediately above the signature line, the contract referred Rainbow to the paragraph that limited API's "MAXIMUM LI-

189

ABILITY." Thus, the parties clearly understood the clause at issue to be a stipulated damages clause.

¶ 32. The second and third factors are "intertwined, and both use a combined prospective-retrospective approach." *Wassenaar,* 111 Wis. 2d at 531. That is, the reasonableness must be judged as of the time of formation and at the time of breach. *Id.* at 532. Furthermore, "[t]he greater the difficulty of ascertaining damages due to breach, the more probable it is that the stipulated damages are reasonable." *Koenings,* 126 Wis. 2d at 363 (citing *Wassenaar,* 111 Wis. 2d at 530–31).

¶ 33. In our view, the contract drafted by API attempted to strike a fair bargain between the parties in order to keep advertising rates reasonable and competitive with other telephone directory publishers. API was merely trying to add predictability to its advertising contracts to avoid the difficulties inherent in attempting to calculate lost profits due to the differing types of potential errors or omissions. Furthermore, we conclude that returning the full contract price, along with a future advertising credit of like amount, is a reasonable award of damages in light of the completely speculative damages that Rainbow may have suffered. Again, if Rainbow wanted to bargain for a higher award of damages in the event of API's omission of its advertisement, it could have done so under the terms of the contract.

¶ 34. As the circuit court noted, courts have approved and even encouraged this type of contract with great regularity in a number of situations.[4] Addition-

---

[4] *See, e.g., Kernz,* 266 Wis. 2d 124 (employment contract); *Westhaven Assocs., Ltd. v. C.C. of Madison, Inc.,* 2002 WI App

ally, API argues that other telephone directory publishers in Wisconsin routinely include similar stipulated damages clauses in their advertising contracts. API further argues that virtually all other jurisdictions permit telephone directory publishers to limit their yellow pages liability based on freedom of contract principles. *See Pinnacle Computer Servs., Inc. v. Ameritech Publ'g, Inc.*, 642 N.E.2d 1011, 1014, n.1 (Ind. Ct. App. 1994) (citing cases that arose before and after the *Discount Fabric* decision)[5]. After the changes in the telecommunications industry, there is no reasonable rationale to hold API to a different standard than other telephone directory publishers. As such, we hold that the stipulated damages clause in the Rainbow-API contract is reasonable.

¶ 35. Finally, we note that the contrasting nature between this case and the exculpatory contract cases we have decided since *Discount Fabric,* further persuades us that the contract clause at issue is not exculpatory but a valid, stipulated damages clause that is frequently agreed to between two entities in a standard business

230, 257 Wis. 2d 789, 652 N.W.2d 819 (lease); *Pollack v. Calimag,* 157 Wis. 2d 222, 458 N.W.2d 591 (Ct. App. 1990) (business agreement).

[5] Most jurisdictions have characterized similar yellow pages contract clauses as exculpatory clauses; however, other jurisdictions have characterized such clauses as limitation of damages clauses. *Compare Trimble v. Ameritech Publ'g, Inc.,* 700 N.E.2d 1128 (Ind. 1998), *with Vasilis v. Bell of Pa.,* 598 A.2d 52 (Pa. Super. Ct. 1991). Regardless, the detailed schedule of damages, the provision for a future advertising credit of like amount for a complete omission of an advertising unit, and the bargaining provision in the Rainbow-API contract convince us that the clause at issue is a valid, stipulated damages clause and not an exculpatory clause as in *Discount Fabric.*

191

relationship. As we have frequently stated, Wisconsin case law does not favor exculpatory agreements. *Atkins v. Swimwest Family Fitness Ctr.,* 2005 WI 4, ¶ 12, 277 Wis. 2d 303, 691 N.W.2d 334 (citing *Richards v. Richards,* 181 Wis. 2d 1007, 1015, 513 N.W.2d 118 (1994); *Dobratz v. Thomson,* 161 Wis. 2d 502, 468 N.W.2d 654 (1991)). Indeed, each exculpatory contract that this court has looked at in the past 25 years has been held unenforceable. Alexander T. Pendleton, *Enforceable Exculpatory Agreements: Do They Still Exist?,* 78 Wis. Lawyer 16 (August 2005) (discussing *Atkins,* 277 Wis. 2d 303, and citing *Yauger v. Skiing Enters., Inc.,* 206 Wis. 2d 76, 557 N.W.2d 60 (1996); *Richards,* 181 Wis. 2d 1007; *Dobratz,* 161 Wis. 2d 502; *Arnold v. Shawano County Agric. Soc'y,* 111 Wis. 2d 203, 330 N.W.2d 773 (1983), overruled on other grounds by *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 401 N.W.2d 816 (1987); and *Merten,* 108 Wis. 2d 205).

¶ 36. There is a common thread that runs through this line of cases that is absent from the circumstances of this case. In each of the above cases, an owner or operator, through a broad, all-inclusive release form, attempted to avoid *all* liability for *death or serious personal injuries* arising from virtually any conduct, including intentional or reckless acts, of the owner or operator. There is a fundamental difference between the above situation and the current one, which deals with one business entity agreeing to limit the maximum financial recovery for a potential mistake of the other business entity.

¶ 37. This case is more on point with *Deminsky v. Arlington Plastics Machinery,* 2003 WI 15, 259 Wis. 2d 587, 657 N.W.2d 411, than with the exculpatory contract line of cases. In *Deminsky,* we considered whether an indemnification clause in a sales contract between a

manufacturer and a purchaser of a grinding machine was valid and enforceable. *Id.*, ¶¶ 1–2. The clause required the product purchaser, Image Plastics, Inc. (Image), to indemnify the manufacturer for liability created by the manufacturer's own negligence or the machine's defects. *Id.*, ¶¶ 22–25. Image argued that it lacked the proper notice of the terms of the agreement, the terms were inconspicuous, and the terms were commercially unreasonable. *Id.*, ¶ 26. The contract at issue was printed on a double-sided, single-page form. *Id.*, ¶ 29. Directly above the signature line was a warning that terms and conditions, including the separately numbered indemnity provision, were on the back of the form. *Id.*

¶ 38. First, this court determined that the relevant terms of the contract were conspicuous under Wis. Stat. § 401.201(10) (1995–96),[6] and the form provided adequate notice to the purchaser. *Id.*, ¶¶ 29–30. The purchaser simply did not read the contract carefully. "Had [Image's agent] read the terms, we have no difficulty concluding that he would have ascertained the obligations of the contract terms. Therefore, the form fulfilled the requirement to communicate the nature and significance of the indemnity provision[,]"

---

[6] Wisconsin Stat. § 401.201(10) (1995–96) stated:

(10) "Conspicuous": A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON-NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous". Whether a term or clause is "conspicuous" or not is for decision by the court.

There have been no material changes to this statute since this time.

and the agent's decision not to read the contract carefully did not warrant subsequent relief from its terms. *Id.*, ¶ 30.

¶ 39. Second, we rejected the purchaser's argument that the sales contract was a contract of adhesion, and therefore commercially unreasonable. *Id.*, ¶ 31. "A contract of adhesion is generally found under circumstances in which a party has, in effect, no choice but to accept the contract offered, often where the buyer does not have the opportunity to do comparative shopping or the organization offering the contract has little or no competition." *Id.*, ¶ 31 (citing *Katze v. Randolph & Scott Mut. Fire Ins. Co.*, 116 Wis. 2d 206, 212–13, 341 N.W.2d 689 (1984)). Applying this rationale, we determined that Image had options, even if those other options may not have been as desirable.

> Customers make choices such as these every day. That Image did not like the other options available does not create a contract of adhesion or make the terms of this contract substantively unconscionable. This is not like the *Discount Fabric* case in which the customer had only one viable option for reaching people through an ad in the telephone book.

*Id.* (citing *Discount Fabric*, 117 Wis. 2d at 603–04).

¶ 40. We concluded with the following:

> There were no elements of an adhesion contract here, because Image had choices. The form and terms provided adequate notice to Image of the indemnity clause and the indemnity clause and related terms were conspicuous. The parties to this contract were two commercial entities with prior dealings. As such, Image has failed to show there is any quantum of procedural

or substantive unconscionability regarding this contract. We hold that the indemnity clause is valid and enforceable.

*Id.,* ¶ 32.

¶ 41. The reasoning and analysis of *Deminsky* are persuasive, despite the substantive differences between the two clauses. Because we concluded in *Deminsky* that the indemnity clause in the sales contract was valid, the manufacturer was essentially able to shift all financial responsibility for the injuries its machine caused to the plaintiff onto Image because Image knowingly and voluntarily agreed to the sales contract. Thus, an apparently innocent purchaser bore the burden of liability for the alleged faults of the manufacturer because the two business entities had agreed to such terms. Here, the parties contemplated the complete omission of the advertisement (along with other lesser errors and omissions), and by its signature Rainbow agreed to the stipulated damages outlined in the contract. Despite the complete innocence of Rainbow, the return of its purchase price and a subsequent advertising credit were all the parties contemplated and agreed to. Thus, as a matter of policy, we see no reason why the result in this case should be any different from the result in *Deminsky.*

¶ 42. We should also note that the relevant components of the contract in this case are almost identical to the contract in *Deminsky.* The Rainbow-API contract was a one-page, two-sided form. The front of the form, entitled "Ameritech Customer Receipt," listed the monthly charge for placing Rainbow's advertisement in the three directories. Directly above the signature line, the form states: "I HAVE READ AND UNDERSTAND THE TERMS AND CONDITIONS ON THE

195

FACE AND REVERSE SIDE *PARTICULARLY THE PARAGRAPH WHICH LIMITS MY REMEDIES AND PUBLISHER'S MAXIMUM LIABILITY IN THE EVENT OF ANY ERROR OR OMISSION.*" (Emphasis added.) The back of the form, entitled "TERMS GOVERNING YOUR REQUEST FOR ADVERTISING," lists paragraph by paragraph the important provisions of the agreement, including the stipulated damages clause, which also appeared in all capital letters. Furthermore, Rainbow admits that a co-owner read the document before signing it. Thus, we have no difficulty in concluding that the contract met the notice and conspicuousness requirements under *Deminsky*.

¶ 43. Furthermore, like Image, Rainbow had choices. The affidavit of Craig Cerqua demonstrates that Rainbow had other advertising options available in the relevant markets besides the telephone directory service offered by API. Rainbow could have advertised with Yellow Book USA or USXchange. Rainbow also had the option of advertising on the Internet. The fact that Rainbow preferred the service of API because of its larger customer base does not make API's contract substantively unconscionable under *Deminsky*.

## V. CONCLUSION

¶ 44. In sum, under the revamped telecommunications industry, the Rainbow-API contract is like any other contract entered into between two voluntary and knowledgeable business entities in a competitive field. The rationale behind *Discount Fabric* is simply inapplicable to the situation presented by this case.

¶ 45. Although we conclude that *Discount Fabric* is still viable, the case presented before us is factually distinct in two important ways. First, Ameritech does

196

not possess a monopoly as Wisconsin Telephone did when *Discount Fabric* was decided. Second, when comparing all of the circumstances of this case with *Discount Fabric*, the clause at issue is not exculpatory, but rather, a valid and enforceable stipulated damages clause. Therefore, we affirm the circuit court's grant of summary judgment in favor of API.

*By the Court.*—The decision of the circuit court is affirmed.

¶ 46. SHIRLEY S. ABRAHAMSON, C.J., did not participate.

¶ 47. ANN WALSH BRADLEY, J. (*dissenting*). I agree with the majority that our jurisprudence regarding exculpatory clauses remains as vibrant as ever. *See* majority op., ¶ 35. Such clauses have been, are, and will continue to be looked upon with disfavor.[1]

¶ 48. I also agree with the majority that *Discount Fabric House of Racine, Inc. v. Wisconsin Telephone Co.,* 117 Wis. 2d 587, 345 N.W.2d 417 (1984), is still good law. *See* majority op., ¶¶ 3, 45. I part ways with the majority, however, in its application of that law to the record in this case. The majority obfuscates the focus of the summary judgment inquiry by engaging in generalizations as to time and location rather than focusing on the specific times and locations relevant here.

¶ 49. As the majority recognizes, it is clear that "Wisconsin case law does not favor exculpatory agreements." Majority op., ¶ 35. "Indeed," says the majority, "each exculpatory contract that this court has looked at in the past 25 years has been held unenforceable." *Id.*

---

[1] *See, e.g., Atkins v. Swimwest Family Fitness Ctr.,* 2005 WI 4, ¶ 12, 277 Wis. 2d 303, 691 N.W.2d 334; *Merten v. Nathan,* 108 Wis. 2d 205, 210–11, 321 N.W.2d 173 (1982).

197

(citing Alexander T. Pendleton, *Enforceable Exculpatory Agreements: Do They Still Exist?*, 78 Wis. Lawyer 16, (August 2005)).[2]

¶ 50. Just last term this court reaffirmed its restrictive approach to exculpatory agreements in *Atkins v. Swimwest Family Fitness Center*, 2005 WI 4, 277 Wis. 2d 303, 691 N.W.2d 334:

> Wisconsin case law does not favor such agreements. While this court has not held that an exculpatory clause is invalid per se, we have held that such a provision must be construed strictly against the party seeking to rely on it.

*Atkins*, 277 Wis. 2d 303, ¶ 12 (citations omitted).

¶ 51. Time and time again, this court has held exculpatory agreements unenforceable and has stated the rule that such agreements are disfavored. On this, the majority and I agree.

¶ 52. I also agree with the majority that *Discount Fabric* remains good law. *See* majority op., ¶¶ 3, 45. One of the key principles of *Discount Fabric* is that a contract is unconscionable if there is an absence of meaningful choice for one party together with contract terms that are unreasonably favorable to the other party. This principle is well-settled[3] and infuses the

---

[2] The cases to which the article refers are *Atkins*, 277 Wis. 2d 303; *Yauger v. Skiing Enterprises, Inc.*, 206 Wis. 2d 76, 557 N.W.2d 60 (1996); *Richards v. Richards*, 181 Wis. 2d 1007, 513 N.W.2d 118 (1994); *Dobratz v. Thomson*, 161 Wis. 2d 502, 468 N.W.2d 654 (1991); *Arnold v. Shawano County Agric. Soc'y*, 111 Wis. 2d 203, 330 N.W.2d 773 (1983); and *Merten*, 108 Wis. 2d 205.

[3] *See Deminsky v. Arlington Plastics Mach.*, 2003 WI 15, ¶ 27, 259 Wis. 2d 587, 657 N.W.2d 411; *Discount Fabric House of Racine, Inc. v. Wisconsin Tel. Co.*, 117 Wis. 2d 587, 601, 345

majority's analysis, even as it characterizes the agreement here as a stipulated damages clause. *See* majority op., ¶¶ 39–43; *see also* majority op., ¶¶ 27, 33.

¶ 53. Where I disagree with the majority is in its application of *Discount Fabric* in light of the record in this case, decided on summary judgment. Although the majority recites summary judgment standards, it does not properly apply them. If it did, it could not reach the result that it does under *Discount Fabric*. Allow me to demonstrate.

¶ 54. In *Discount Fabric,* the court recognized that the yellow pages aspect of the phone company's dealings was "not legally monopolistic." *Discount Fabric,* 117 Wis. 2d at 594. The court invalidated the exculpatory clause in *Discount Fabric* (1) because of the phone company's "decisive advantage of bargaining strength" and (2) because there was no significant competition. *Id.* at 594, 596, 604. Acknowledging the existence of other yellow pages publishers in the relevant area, the court concluded that there was no "other mode of advertising . . . which reaches as many customers, is of a similar nature as the yellow pages, and is inexorably tied to the telephone service." *Id.* at 591, 594.

¶ 55. The question is not, as the majority would have it, simply whether the telecommunications industry has generally opened to competition since the time of *Discount Fabric* in 1984. Of course it has.

¶ 56. Rather, the question the majority should be asking is whether the yellow pages advertising market was any different in 1999 in Oconomowoc and Wauke-

N.W.2d 417 (1984); *First Fed. Fin. Serv., Inc. v. Derrington's Chevron, Inc.,* 230 Wis. 2d 553, 558, 602 N.W.2d 144 (Ct. App. 1999); *Leasefirst v. Hartford Rexall Drugs, Inc.,* 168 Wis. 2d 83, 89, 483 N.W.2d 585 (Ct. App. 1992)

sha and in 2000 in Watertown than the market addressed in *Discount Fabric*. The answer is unclear. It is precisely this uncertainty that renders this case unsuitable for summary judgment disposition.

¶ 57. The majority shifts the focus of the summary judgment inquiry. The relevant time is 1999–2000. The relevant locations are Oconomowoc, Waukesha, and Watertown. The majority obfuscates this by engaging in generalizations, apparently relying on data for 2002 and data for Milwaukee. *See* majority op., ¶¶ 9, 23.

¶ 58. Rainbow's summary judgment materials include an affidavit by Frank Paoletti, the API employee who negotiated with Rainbow. He averred that during the time period of September 1997 to September 2000, he was aware of "no other book that had the depth of distribution and penetration comparable to that of Ameritech's Yellow pages" and that API had "no real competitors in the advertisement/yellow page market." An attachment to his affidavit showed that in Oconomowoc in 1999–2000, 99.3 percent of households had a telephone.

¶ 59. In API's sparse summary judgment materials, one of its regional marketing managers averred that consumers in the Waukesha area consulted Ameritech's competitors 9 percent of the time in 1998 and 41 percent of the time in 2002. The regional manager's affidavit gives no such statistics for Oconomowoc or Watertown for any year. Rather, it makes general factual assertions. For example, the regional manager avers that there has been increasing competition "since the late 1990's" and that there has been one "serious competitor" for "several years" in "Milwaukee and the rest of southeastern Wisconsin."

200

¶ 60. Unlike the majority, I view these materials in a light most favorable to Rainbow, as summary judgment methodology requires. In doing so, I conclude that the materials demonstrate a genuine issue of material fact as to whether, at the relevant time in the relevant markets, API had any more than negligible competition as contemplated in *Discount Fabric.* Here, on this record, it remains disputed whether there was any "other mode of advertising . . . which reaches as many customers, is of a similar nature as the yellow pages, and is inexorably tied to the telephone service." *Discount Fabric,* 117 Wis. 2d at 594.

¶ 61. An opportunity to bargain is another, related material fact under *Discount Fabric.* The parties in *Discount Fabric* stipulated as follows:

> that all yellow pages advertising in Wisconsin for the year in question utilized the same form contract. Furthermore, none of the telephone company's employees or agents had the authority to alter any of the terms or provisions of the standard contract, nor had they ever done so. The parties also stipulated that there was never any bargaining on either price or terms with any advertiser; each subscriber in the Racine directory paid exactly the same for the same size listing or advertisement.

*Id.* at 589–90.

¶ 62. The majority says these are "important stipulations." Majority op., ¶ 17. I agree that they are important, and they underscore the existence of genuine issues of material fact here.

¶ 63. Turning again to API's sparse summary judgment materials, API offers no affirmative evidence of Rainbow's opportunity to bargain, other than the language of the contract itself. In contrast, Rainbow's responsive materials include an averment by Paoletti

that as a representative of API he was not authorized to change the terms of the form contract.

¶ 64. Moreover, the contract itself is internally inconsistent as to the opportunity to bargain. It states that the customer may negotiate different terms including higher liability limits, as the majority emphasizes. However, it also contains the following provisions:

> IN ORDER TO MAINTAIN OUR PRICING SCHEDULES, WE CANNOT AND DO NOT ACCEPT LIABILITY FOR LOST PROFITS OR FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF ERRORS OR OMISSIONS. . . .
>
> . . . .
>
> UNDER NO CIRCUMSTANCES (1) WILL OUR LIABILITY FOR ANY ADVERTISING UNIT EXCEED THE AMOUNT YOU HAVE ACTUALLY PAID FOR IT TOGETHER WITH FUTURE PAGESPLUS ADVERTISING CREDIT OF LIKE AMOUNT . . . .

¶ 65. Again, and unlike the majority, I follow summary judgment methodology and construe the parties' summary judgment materials in the light most favorable to Rainbow, not in a light most favorable to API. In doing so, I conclude that the internal inconsistency of the contract and Paoletti's affidavit raise an issue of material fact as to whether Rainbow had any real opportunity to bargain. At a minimum, they raise a reasonable inference that the opportunity to bargain stated in the contract is illusory.

¶ 66. In short, the parties' summary judgment materials raise genuine issues of material fact under *Discount Fabric*. It remains disputed whether, in the relevant markets at the relevant time, API's yellow pages business, even if "not legally monopolistic," left

Rainbow with no "other mode of advertising . . . which reaches as many customers, is of a similar nature as the yellow pages, and is inexorably tied to the telephone service." *Discount Fabric,* 117 Wis. 2d at 594. It remains disputed whether, in the relevant markets at the relevant time, API had a "decisive advantage of bargaining strength." *Id.* at 596. It remains disputed whether Rainbow had any real opportunity to bargain. Thus, I would reverse the circuit court's grant of summary judgment.

¶ 67. In sum, although I agree with the majority that our jurisprudence regarding exculpatory clauses remains as vibrant as ever and that *Discount Fabric* remains good law, I disagree with the majority's application of the law here. Accordingly, I respectfully dissent.